**FILED**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

JUN 1 6 2006

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

| | | |
|---|---|---|
| ELLEN JANE KUTTEN,<br>individually, and on behalf<br>of her daughters | ) | |
| and | ) | **Case No.:** |
| MARY ANN ARNOLD,<br>ELSIE MAHLER SCHARFF,<br>JOHN F. MEDLER, JR.,<br>MICHAEL R. MEDLER, and<br>JEFFREY P. MEDLER,<br>on behalf of themselves,<br>and all others similarly situated, | ) | **4 06CV0 0937C A S** |
| **Plaintiffs,** | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| BANK OF AMERICA, N.A. | ) | |
| and | ) | **CLASS ACTION** |
| BANK OF AMERICA CORPORATION, | ) | |
| **Defendants.** | ) | |

## COMPLAINT

COME NOW Plaintiffs Ellen Jane Kutten, individually on behalf of herself, and her

daughters, Alessandra Kutten Cottrell and Louise Kutten Cottrell, and Mary Ann Arnold, Elsie

Mahler Scharff and John F. Medler, Jr., Michael R. Medler and Jeffrey P. Medler (hereinafter

Medlers), for themselves and for all other members of the Classes hereinafter described, by and

through counsel, and state and allege as follows:

## OVERVIEW

1.      This Class Action is brought by Plaintiffs Mary Ann Arnold, Elsie Mahler

Scharff and the Medlers on behalf of themselves, and all others similarly situated, and by

Plaintiff Ellen Jane Kutten, individually, on behalf of herself and her daughters, all of whom are

or were beneficiaries of fiduciary accounts for which the Defendant Bank of America N.A.

("Bank") serves or served as corporate trustee.

2. The allegations in this Complaint are directed at the Bank, as well as its parent company, Bank of America Corporation ("BAC"), for their breaches of fiduciary and contractual duties owed by them to beneficiaries of fiduciary accounts, as well as violations of federal law, arising from the Defendants' self-dealing, wholesale re-direction of trust assets from their historic allocations in in-house, fee-free Common Trust Funds to the Bank's proprietary mutual funds, the Nations Funds (hereinafter, "Conversion"), which were serviced and advised by the Bank's affiliates and controlled by subsidiaries of Defendant BAC.

## THE PARTIES

3. Plaintiffs are all present or former beneficiaries of the Bank's fiduciary accounts whose assets were invested in the Defendants' in-house proprietary mutual funds, known as the Nations Funds ("Nations Funds").

4. Plaintiff Ellen Jane Kutten is a California citizen who has varying interests as beneficiary, contingent beneficiary, as well as co-trustee of several trusts which had been, until the fall of 2003, managed and controlled by the Bank, its corporate parent and affiliates. In particular, Plaintiff Kutten is a named beneficiary under trusts created by her parents in this District in 1981, as amended in 1983, 1987 and 1990, namely, the Joseph Kutten Indenture of Trust and the Carolyn J. Kutten Indenture of Trust. In addition, Plaintiff Kutten and her daughters were beneficiaries of trusts established in 1989, namely, the Joseph Kutten and Carolyn Y. Kutten 1989 Grandchildren's Trust (collectively referred to hereinafter as the "Kutten Trusts"). The Kutten family's relationship with the Bank and its predecessors, including her grandfather, noted St. Louisan and philanthropist, Charles H. Yalem, spans a period in excess of forty years.

2

5. Plaintiff Mary Ann Arnold is a Nevada citizen who has varying interests pursuant to a Trust established under California law by her grandfather, John T. Crowley, through his Last Will and Testament ("the Crowley Trust"), including her status as a beneficiary thereof, said Trust having been managed and controlled by the Bank, its corporate parent and affiliates.

6. Plaintiff Elsie Mahler Scharff is a Missouri citizen who has varying interests pursuant to the Nicholas Scharff Trusts and the Pauli R. Scharff Revocable Trust established under Missouri law, including her status as a beneficiary thereof, said Trusts having been managed and controlled by the Bank, its corporate parent and affiliates.

7. Plaintiff Medlers are Missouri citizens who are beneficiaries of certain testamentary trusts established in Missouri under the Last Will and Testament of Frances B. Lubbe, deceased (the "Lubbe Trusts"), said trust having been managed and controlled by the Bank, its corporate parent and affiliates.

8. Defendant Bank is a federally chartered bank, deemed a citizen of North Carolina, and a wholly owned subsidiary of BAC.

9. BAC is a financial holding company and the parent of the Bank. BAC is domiciled in North Carolina and incorporated in Delaware. At all relevant times, BAC dictated and controlled the business activities of the Bank, including, *inter alia*, the business activities described herein and occurring within this District, and wherever in the United States the Bank, BAC and/or their respective predecessors conducted business.

10. BAC owns and controls, either directly or through the Bank, various other entities, including Columbia Management Advisors, L.L.C. f/k/a Bank of America Capital Management LLC, Columbia Management Advisors, Inc., a registered investment adviser under the 1940 Act (hereinafter "an RIA"), Banc of America Advisors, Inc. (an RIA), Columbia Management Distributors, Inc. f/k/a BACAP Distributors, LLC, Bank of America Capital

3

Advisers, LLC (an RIA) and Bank of America Investment Services, Inc. (collectively, the "Bank Subsidiaries"), which controlled and directed the activities of the Nations Funds Trust (hereinafter, "NFT" n/k/a Columbia Funds Series Trust) during the relevant time period.

11. At all relevant times herein, the Bank was Successor Trustee of the Kutten Trusts, the Crowley Trust and the Scharff Trusts. The Bank and the Hon. Mary Ann L. Medler are currently the Co-Trustees of the Lubbe Trusts. The Bank is also the Trustee or serving in another fiduciary role, with respect to the other Trusts or other fiduciary accounts of which the remaining members of the Class defined below are beneficiaries.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 22 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77(v); § 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a; the Investment Adviser's Act of 1940 ("the Adviser's Act"); 15 U.S.C. § 80b-1; 28 U.S.C. § 1332(b), the Class Action Fairness Act of 2005 and 28 U.S.C. § 1367. The value of the relief sought on behalf of Class members exceeds $5,000,000, exclusive of interest and costs. Further, there is diversity of citizenship between Plaintiffs, citizens of Missouri, Nevada and California, and each of the Defendants, who are citizens of other states. In addition, as set forth below, Plaintiff Kutten has sustained damages in excess of $75,000, exclusive of interest and costs and, separately, has accrued recoverable attorneys' fees in excess of $75,000.

13. Further, the claims of Plaintiff Kutten have a value of not less than $1,150,368, excluding attorneys' fees relating to this action, consisting of attorney fees and fees paid to the Bank relating to the resignation of the Bank as Trustee; losses from investments; excess fees; and, repeated and continuing failures to invest according to the terms of the written instrument, which are set forth more specifically in Counts 16 to 20 hereof.

4

14. In addition to the foregoing claims, Plaintiffs Kutten, Scharff and the Medlers assert claims under and pursuant to Missouri law, Chapter 456 (Missouri Uniform Trust Code) RS Mo. which also provide for, *inter alia,* payment of their counsel fees. (Section 456.10-1004 RS Mo. 2005). To date, such Plaintiffs' counsel fees exceed $75,000, exclusive of interest and costs.

15. The plan and scheme by the Defendants to unlawfully market Nations Funds within and from this District was and is an essential, purposeful and integral component of the Bank's strategy and business plan to be a nationwide financial institution as set forth herein. This Court has personal jurisdiction over the Defendants given their systematic, repeated and continuing contacts with and within this District, including the contacts with the other "controlled persons" and members of the Class as described herein.

16. Although the Bank and BAC now have their principal places of business in Charlotte, North Carolina, they conduct substantial business within this District in many locations through the Bank's "Private Bank" and numerous retail branches. At all relevant times, the Defendants were "control persons" of the Bank Subsidiaries, NFT and its Board of Trustees/Directors ("NFT Trustees"). These subsidiaries, in turn, controlled and directed the activities of the Nations Funds during the relevant time period.

17. In light of the foregoing substantial contacts with this District, each Defendant can reasonably be expected to be subject to the jurisdiction of this Court, particularly since Plaintiffs' claims as asserted herein specifically arise from and are directly related to the Defendants' contacts with this District as described above.

18. Venue is proper in this District pursuant to §22 of the Securities Act, §27 of the Exchange Act and 28 U.S.C. §1391(b) because each of the Defendants had undeniable daily and

5

regular contacts with this District by reason of, *inter alia*, their common scheme and plan to implement the Conversion as set forth herein.

19.    Venue is proper in this District because many of the acts and practices complained of herein had their origin in and/or occurred in substantial part in this District. Further, many significant witnesses to the wrongdoing alleged herein are found in and/or did business within this District and will only be available for trial purposes in this District. Plaintiffs Scharff and the Medlers reside in this District, as do many members of the Class. In addition, a substantial amount of documents relevant to the claims asserted herein including, in particular, documents relating to the sale of Nations Funds to Plaintiffs and numerous other beneficiaries of the Bank's fiduciary accounts are located in this District.

## CONTROL PERSON LIABILITY

20.    At all relevant times, BAC and the Bank were and presently are "control persons" as such term is defined pursuant to the § 15 of the Securities Act and § 20 of the Exchange Act inasmuch as they have the power and authority and exercised the same to totally dominate and control each of the Bank Subsidiaries, NFT and the NFT Trustees with respect to the conduct which is the subject of this litigation.

21.    As such, BAC and the Bank are responsible for and liable to Plaintiffs and the members of the Federal Securities Sub-Class defined below for the primary violations of the Securities Act and the Exchange Act by the "controlled persons" as described herein.

## ALLEGATIONS COMMON TO ALL COUNTS

### A.    *Acquisition of Other Financial Institutions*

22.    Over the course of more than 15 years, the Bank and BAC made numerous acquisitions of other financial institutions throughout the United States, many of which were driven by their former Chairman and Chief Executive Officer, Hugh L. McColl, Jr. Mr. McColl

6

was assisted by his subordinates, Kenneth Lewis, the current Chairman and Chief Executive

Officer, and James H. Hance, Jr., former Vice Chairman and Chief Financial Officer, whom

Mr. Lewis described as "one of the key architects of [BAC and the Bank] as it has grown to be

one of the largest financial service providers in the world."

23.     The acquisitions were part of the Bank's business plan pursuant to which many

of the investment-related and other services to beneficiaries of fiduciary accounts as described

herein, would be eliminated, thereby decreasing the Bank's costs of handling said accounts,

while increasing the profits generated there from. In a November 1998 speech, Mr. Hance set

forth the objectives as follows:

> We also are diversifying our revenue stream away from dependence on
> gathering deposits and lending them and toward fee income. The latter is
> now about 40 percent of our total revenues and our goal is to push fees to
> more than half of revenues in a short period of time.
>
> \*       \*       \*
>
> The leverage as you increase the assets of a fund is significant.
>
> \*       \*       \*
>
> **The most obvious advantage of scale is cost. Perhaps the best
> advantage is the exploding world of mutual funds. As the second
> largest player among banks, we have achieved significant scale. The
> leverage as you increase the assets of a fund is significant. After all,
> one money manager can manage $5 million or $50. So as you get
> bigger, you get much, much more profitable.**
>
> [Emphasis added]

24.     During a speech he delivered in Charlotte on May 26, 2004, Mr. Lewis, in

explaining how BAC and the Bank could justify the high-cost acquisitions of other banks in

financial terms said:

> In deliberating the wisdom of [their most recent] merger, much of the
> discussion outside the company has focused on expense savings and
> efficiencies. That's understandable - the history of mergers in our industry
> has been all about expense leverage. I believe expense savings and
> efficiency in this merger are critical, but only as a starting point.

7

25.     Mr. Lewis' explanation of how Defendants could squeeze "savings and

efficiencies" from BAC's then most recent acquisition was reinforced in the business

media several months later in April 2004 by David Pauly, writing for Bloomberg News:

> In October, [BAC] CEO Kenneth Lewis announced the $48.1 billion
> takeover of Fleet Boston Financial Corp. - thereby infuriating Bank of
> America shareholders who said Lewis had committed himself to
> managing the company's myriad acquisitions of the past.
>
> *   *   *
>
> Lewis offered Fleet Boston stockholders a premium of 43% above the
> market price. A lot of jobs will have to go to make up for the excessive
> payment.

26.     In the context of this nationwide series of acquisitions, and in order to justify the

high premiums that Messrs. McColl, Lewis and Hance were paying for the acquired financial

institutions ("Acquired Banks"), with each new acquisition, they required the centralization and

streamlining of the fiduciary services offered by the Bank, including the increased usage of

Nations Funds as vehicles for investment of the Bank's fiduciary assets.

27.     Over the years, the Bank and its corporate predecessors swallowed-whole

Boatmen's Trust Company, and numerous other Acquired Banks, which had fiduciary

responsibilities to Plaintiffs and members of the Class. In the process, these formerly

independent institutions' fiduciary operations were transmogrified into just cogs in the fee-

generating machinery of the Bank and its corporate parent.

28.     In the course of the metamorphosis of Boatmen's Trust Company and other

acquired financial institutions into the Bank, the interests of Plaintiffs and members of the Class

were not represented by caring, knowledgeable trust officers, but were frequently "serviced" by

"Call Centers" in Dallas and Atlanta, as well as elsewhere. These "Call Centers" were manned

by lower-level Bank personnel with little or no investment expertise, who employ computerized

8

asset allocation programs designed to maximize the use of the Bank's Nations Funds. Except for the highest net worth fiduciary accounts, the "customized recommendations" and "wealth management expertise" promised by the Bank are fictions and have been fictions since the consolidation of the various Acquired Banks began taking place.

29.    Joseph Kutten and Carolyn Yalem Kutten (parents of Plaintiff Kutten), in entrusting their assets to Boatmen's Trust Company in St. Louis, a local bank, did so based upon personal relationships with officers of Boatmen's, and its predecessors in interest, St. Louis Union Trust Company and Centerre Bank, built over many years. The fiduciary relationship was established because, *inter alia*, Boatmen's Trust Company and its predecessor banks, held itself out to Joseph and Carolyn, and to other prospective customers of fiduciary services, as institutionally and personally suited not only to the stewardship of their assets over multiple generations, but looking after their descendants, such as the Plaintiffs in this litigation. Similarly, the grandfather of Plaintiff Arnold, John T. Crowley, through his Last Will and Testament, entrusted his bequeathed assets to a local bank in California. The successor Trustee was a corporate predecessor of the Bank, since acquired by a series of banks, now part of Bank of America. Plaintiff Scharff's father, Nicholas Scharff, and mother, Pauli Scharff, entrusted their assets to Boatmen's Trust Company, as did the grandmother of the Medlers.

30.    At or prior to the time that Boatmen's Trust Company was acquired by the Bank's predecessor, Nations Bank, it was known by the parties to the acquisition negotiations that the successor entity (i.e. Nations Bank) would materially adversely affect the administration of the fiduciary accounts of plaintiffs Kutten, Scharff and Medler and all other Boatmen's fiduciary accounts. Similarly, this was the plan of the Defendants with respect to each of the Acquired Banks and their fiduciary functions.

31.    To the best of the knowledge, information and belief of Plaintiffs Kutten, Scharff,

9

and the Medlers, neither Boatmen's nor Nations Bank provided to them or other interested parties in connection with other fiduciary accounts venued in Missouri appropriate written notice as provided in §362.331 R.S.Mo. of Boatmen's transfer of fiduciary capacities to Nations Bank disclosing all material facts which disclosed the material adverse affect of such transfer or advising such interested parties (including Plaintiffs Kutten, Scharff and Medlers and members of the Missouri Sub-Class) that they had a right to object to the transfer and, *inter alia*, obtain a replacement fiduciary.

32. Plaintiffs believe and therefore allege that the Bank similarly failed to provide such notice in each of the other instances where the fiduciary responsibilities of an Acquired Bank were taken over by the Bank or one of its predecessors. As such, all similarly affected beneficiaries were wrongly denied notice and the right to object to a transfer of fiduciary responsibilities to the Bank.

### B. *Nations Funds*

33. The Nations Funds consist of a "family" of more than 70 mutual fund portfolios, which are proprietary funds of the Bank. The Nations Funds' portfolios cover a wide variety of investment disciplines, strategies and types of asset categories including, *inter alia*, the Nations Municipal Income Funds, the Corporate Bond Portfolio; the Nations Small Company Fund; Nations Large Cap Index Funds and Nations Cash Reserves.

34. The Nations Funds are nominally operated by NFT and its Board of Trustees, a majority of whom are purportedly independent. In fact, the Bank, as the largest single shareholder of record of the various Nations Funds controls all nominees to the NFT Board and therefore is a "control person" with respect to NFT, the Nations Funds, the NFT Trustees and the Bank Subsidiaries, as such term is defined in the federal securities laws and, in particular, § 15 of the Securities Act and § 20 of the Exchange Act.

10

35.     Certain of the Nations Funds were funded by the Bank and the Bank Subsidiaries
in substantial part by the Conversion, in effect, "force selling" Nations Funds upon the Bank's
captive fiduciary accounts for which it served as corporate fiduciary in exchange for assets that
were either individually managed by the Bank or in Common Trust Funds. Such funding
permitted the affected Nations Funds to have substantial asset bases, an important selling point
to the Defendants and the Bank Subsidiaries in marketing shares in the Nations Funds to other
potential purchasers thereof through the Bank and other subsidiaries of BAC. The Nations
Funds selected for investment of fiduciary assets by the Bank and Bank Subsidiaries pursuant to
the Conversions were intended generally to "mirror" the categories of assets held by the Bank's
fiduciary accounts pre-Conversion, all or most of which were liquidated immediately prior to
the Conversions, either as part of so-called "Common Trust Funds" or in individually-managed
accounts.

### C.     *Conversion*

36.     Historically, the Bank and its predecessors invested the assets comprising the
Kutten Trusts, the Crowley Trust, the Scharff Trusts, the Lubbe Trusts, and those of members of
the Class, primarily through individually managed portfolios and/or through so-called "Common
Trust Funds" or "Collective Investment Funds." The expenses of the Bank for such investment
vehicles and related administrative services were absorbed by the Bank out of its fees for
serving as fiduciary. Beginning some time prior to 1998, in order to, *inter alia*, compensate for
massive losses it was incurring from its traditional lending business, the Bank and its
predecessors developed various business plans pursuant to which they sought to minimize their
operating expenses with respect to fiduciary accounts and maximize their profits from fiduciary
business.

11

37.     Upon information and belief, former Bank Chief Executive Officers, Hugh McColl and Kenneth Lewis, were significant motivating forces behind these plans, which were integral to their master plan of extracting higher profits from the Acquired Banks and consolidating their various trust department and "wealth management" activities under the banner of the so-called "Private Bank." Defendants' plan included the consolidation and elimination of the previously existing trust departments of the Acquired Banks with the objective of "servicing" fiduciary accounts and the beneficiaries thereof, with fewer and fewer personnel and greater standardization of investments in fiduciary accounts.

38.     Pursuant to such business plans, they decided, *inter alia*, to utilize the funds held by the Bank in fiduciary accounts to fund an initial group of mutual funds and/or to add assets to such funds controlled by the Defendants and the Bank Subsidiaries, the above described Nations Funds, as well as other mutual funds merged into them.

39.     Through a complicated and barely comprehensible grouping of advisors, sub-advisors, subsidiaries and other affiliated and unaffiliated service providers, the Defendants, Bank Subsidiaries and the "controlled persons" engineered a scheme pursuant to which the Bank was able to abdicate many of its traditional fiduciary responsibilities, functions and services to beneficiaries of its fiduciary accounts in favor of alternatives that resulted in higher total direct and indirect expense charges to the fiduciary accounts as compared to the trustee or similar fees historically paid to the Bank for, *inter alia*, active internal management of the fiduciary accounts' assets.

40.     Throughout the Class Period defined below, the Defendants developed and implemented a general corporate investment policy pursuant to which most, or all, of the assets in accounts such as the Kutten Trusts, the Crowley Trust and the Lubbe Trusts and other fiduciary accounts similarly situated, would be uniformly converted into shares of the Nations

12

Funds (the "Conversion"), or only invested in such mutual funds at the outset. The management and investment decisions of the Nations Funds were controlled by the Bank Subsidiaries and by the Board of NFT, which was itself controlled and dominated by the Defendants.

41. As part of this corporate policy, the investment in non-proprietary funds would be prohibited to the greatest extent possible. Indeed, in a letter from the Bank dated October 1, 1999 to the Hon. Mary Ann Medler, the mother of the Medlers, and a beneficiary of the Lubbe Trusts, the Bank reiterated its policy to only invest in its proprietary funds:

> The [Investment Review] Committee [of the Bank] reiterated that **the use of outside mutual funds in fiduciary accounts is in violation of our corporate policy.**
>
> [Emphasis added].

42. The Federal Reserve System in Supervisory Letter SR 97-3 warned banking organizations that "conversion could result in conflicts between the best interests of the organization and the best interests of its fiduciary customers. The banking organization must also determine that the mutual fund shares are suitable for accounts which previously held common trust fund units. Another possible conflict of interest could arise from the use of *proprietary* mutual funds when there are unaffiliated mutual funds or alternate investment opportunities available that may be equally appropriate for the participant's portfolio. Again, the appearance that the organization put its own interests above those of its fiduciary customers may cause concern particularly if investments are made in a newly established proprietary fund with no history or track record. It is important that the organization thoroughly document its decision to transfer CTFs into proprietary mutual funds."

43. In part to implement safeguards to obviate Federal Reserve concerns, the FDIC and the Office of Comptroller of Currency ("OCC"), federal regulators for national Banks, have created Trust Examination Manuals to serve as guides to Banks, including the Defendant Bank,

13

in their asset management activities, including the use of proprietary mutual funds in fiduciary accounts. The federal government provides an outline on investing to avoid a breach of fiduciary duty. The criteria for proprietary mutual fund investing are contained in Section 3 - Asset Management - Part I. These include due diligence standards which include establishing written investment policies, adoption of procedures for periodic review and comparison with other available funds and establishment of an arm's length process for evaluating the prudence of investing fiduciary accounts in proprietary and bank advised mutual funds rather than in non-proprietary alternative investments. Additionally, the manual suggests on-going comparisons of proprietary funds to peer group performance and fees and warns of "hidden fees" and expense ratios which do not include total costs to the investor.

44.     Section 8 of the Trust Examination Manual - Compliance/Conflicts of Interest, Self-Dealing and Contingent Liabilities discusses prophylactic measures to be undertaken by Banks to avoid fiduciary transactions which may be set aside by the beneficiary, including documenting management's actions with respect to transactions involving real or potential conflicts of interests, including the prudence of such transactions and that that such documentation be readily available. This section talks about issues relating to the Bank's receipt of traditional trustee's fees and the additional fee received by a Bank from investments in its proprietary funds and what a Bank must do to guard against breach of duty.

45.     Excerpts from Appendix C - Fiduciary Law, attached to the Trust Examination Manual lists the states that have removed the *per se* ban on the use of proprietary mutual funds (none of which have ever excused a Bank from further analysis as to whether the use of such funds violated a fiduciary duty) and Federal Reserve Supervisory Letter SR 99-7 entitled "Supervisory Guidance Regarding the Investment of Fiduciary Assets in Mutual Funds and Potential Conflicts of Interest" and discusses the fiduciary pitfalls in the financial incentives for

14

banks to place trust assts into particular mutual funds.

46.     Additionally, the OCC has published Handbooks on Conflicts of Interest and Personal Fiduciary Services discussing the appropriate methods to deal with the use of proprietary mutual funds in fiduciary accounts. Appendix E to the Conflict of Interest handbook discusses what Banks must do to ensure compliance with fiduciary duties when using mutual funds, including annually reviewing that the proprietary mutual fund continues to be an appropriate investment for the account.

47.     Other than a cursory determination of whether the instrument establishing the fiduciary account prohibited mutual fund investments and review of whether a state's law prohibited the investment, nothing was considered by the Bank on an account by account basis to establish the propriety of a Nation Funds investment. This allowed the Bank to send form letters to those interested in the accounts seeking authorizations or consents to the Conversions that were about to be consummated. All letters to tens of thousands of beneficiaries and/or co-trustees across the country were sent from the Bank of America's newly created "Private Bank" in St. Louis, from its President, David Fisher. No authorization or consent was sought from any fiduciary account for which the Bank could act on its own. No regard was documented by the Bank to adherence to the Bank's fiduciary duties to its fiduciary customers. No or little analysis was performed. The Bank converted CTFs and other assets *en masse* across the board to funnel assets into the Nations Funds for their own benefit to jump-start its asset management and otherwise build up its mutual fund business without regard to federal regulations, the Federal Reserve's Supervisory letter, the OCC or the FDIC guidelines.

48.     The Defendants implemented their business plan (sometime prior to the commencement of the Class Period), through the Bank's "Private Bank". The Private Bank sent out standardized form letters informing some co-trustees, beneficiaries of the fiduciary accounts,

15

and others, of the Bank's planned liquidation of its "Common Trust Funds" and touting the so-

called "benefits" of the Conversions and certain mutual funds "reorganizations". While all of

these Conversions and reorganizations were carried out on a rolling basis and assets were held in

individual accounts in various states, the Conversions did not differ from each other in any

material way.

49.     The standardized form letter, signed by David W. Fisher, President, also coerced

the recipients of the letters to authorize the Conversion of the Trusts' assets into shares in the

Nations Funds, stating:

> Any common trust fund units for which we have not
> received an authorization [by May 1, 2000] may be
> liquidated and the proceeds placed in a money market
> vehicle pending discussion about reinvestment. This
> liquidation could have adverse tax consequences
> depending upon the cost basis of the common trust fund
> units.

50.     In touting the benefits of the Conversion, the letter advised, that:

> Using Nations Funds, we can provide trust and
> fiduciary accounts with an attractive mix of
> investments to pursue the accounts' investment
> goals. Nations Funds also offer the benefits of:
>
> Daily valuation and liquidity
> Newspaper performance listings
> Broader potential diversification
> Flexibility when making trust distributions

16

In fact, there was little, if any, benefit that would flow to beneficiaries of the Bank's fiduciary accounts and this letter was a sham.[1]

51.    Indeed, all such so-called "benefits," could have been accomplished by means of the Bank's direct investment of fiduciary assets internally or through its fee and expense free "Common Trust Funds." Curiously, on or about August 16, 1999, the Bank announced that "Common Trust Funds will be valued at month-end instead of twice each month," despite the fact that computer software programs existed that could generate such valuations on a daily basis.

52.    Although Plaintiff Kutten did receive some documents seeking authorizations for Conversions, as well as Nations Funds prospectuses (that were made a part of registration statements filed with the SEC by the Defendants or one of their "controlled persons" covering the various offerings and sales of Nations Funds shares), said documents did not disclose the conflicts between the interests of the Bank and BAC with those of the beneficiaries of the affected Trust accounts, such as Plaintiffs; further, the Bank concealed that it did not consider other non-proprietary mutual funds such as Vanguard or Fidelity mutual fund families, which had substantially lower expense levels; that the "benefits" touted by the Bank in their correspondence to co-trustees and beneficiaries were illusory and, in fact, false; that while the

---

[1] The Bank did not send such a letter to beneficiaries of all of its fiduciary accounts nor, in the case of guardianships and similar accounts, to the appropriate courts overseeing such accounts. Further, not all co-fiduciaries received such a letter nor were their consents sought by the Bank. The Conversions carried out by Defendants did not differ in any material way for each fiduciary account regardless of its terms and the state in which the account was domiciled. Further, "trust officers" were required, pursuant to a carefully orchestrated plan, to convey the identical information to members of the Class and to similarly threaten them with adverse tax consequences and other "horrors" if they did not indicate their consents to the Conversions. Each such oral solicitation of consent to the Conversion misrepresented the Bank's reasons for carrying it out, concealed the conflicts of interest and the increased investment-related expenses that would be incurred by the Bank's fiduciary accounts post-Conversion and misrepresented that so-called "credits" that the Bank would thereafter apply to fiduciary accounts would be sufficient to compensate for all such additional expenses. Further, as with the Nations Funds prospectuses and other documents provided to beneficiaries and co-fiduciaries, the Bank concealed all the benefits it and its affiliates would derive from the Conversions, including those derived from "bulking-up" the

17

Bank disclosed that certain fees and expenses would be charged, it also advised that the fiduciary accounts would be given a credit against certain of such fees and expenses, making it **appear** as though the incremental expenses of investing in the captive Nations Funds and the credit would off-set each other, when in reality, they did not; and that the Conversion resulted in a material increase in the total expenses assessed to all similarly situated fiduciary accounts (that investment of the assets in these accounts in the Nations Funds, even after so-called "credits" or "rebates," cost more to the beneficiaries of the accounts than pre-Conversion investments of fiduciary assets in the Bank's internal, fee and expense-free Common Trust Funds, for which the Bank absorbed all the expenses thereof in exchange for the fees it received for serving as corporate fiduciary);

53.    In response to such coercion and the deceptive and unclear information provided by the Bank in the disclosure/authorization forms and accompanying prospectuses, upon information and belief, Plaintiff Kutten, co-fiduciaries and beneficiaries of other fiduciary accounts who received such forms, signed the enclosed forms, thereby providing to the Bank their uninformed and fraudulently induced "consent" to the Conversions. Nonetheless, Plaintiff Kutten clearly indicated she did not authorize the Bank to charge a fiduciary fee *and* fees and expenses associated with mutual fund ownership and wrote "NO DOUBLE CHARGES" on her form.

54.    Enclosed with the Bank's letter sent to some fiduciary account beneficiaries and/or co-fiduciaries were various Nations Funds prospectuses and other documents which were drafted so as to conceal, *inter alia*, the motives of the Bank and BAC for the Conversions into Nations Funds, the conflict of interest between the Bank and members of the Class, the benefits

---

Nations Funds and from utilizing the Nations Funds to benefit corporate customers of the Defendants at the expense of the holders of Nations Funds shares.

18

of the Conversions to them and the Bank Subsidiaries, the increased expenses that would be incurred by the fiduciary accounts as a result of the Conversions, that the investment advisory and administrative contracts between and among NFT, the NFT Trustees and the Bank Subsidiaries were entered into on a no-bid basis and, as well, the fact that there would be negative tax effects as a result of the wholesale disposition of the assets in the affected fiduciary accounts, pre-Conversions. These were material facts that the Defendants and their "controlled persons" should have disclosed in the foregoing Nations Funds prospectuses and in the other documents provided to the beneficiaries of the Bank's fiduciary accounts at the times of the Conversions and otherwise when they were selling to such accounts shares of the Nations Funds as underwriters, financial advisers, offerors, selling shareholders and otherwise. There was no explanation in plain English that would put the recipients of these documents on notice of the Bank's wrongdoing as referred to herein. In fact, one of those documents, (Form 3.05D 7/1999) entitled "Disclosure of Investment in Nations Funds," stated deceptively:

> The fee paid directly by the [Trust] Account to the Bank will be reduced (but not below zero) by the Account's pro rata share of the investment advisory fees paid by the Funds to the Service Providers; provided however, that the amount of the reduction will be based on Bank of America Corporation's percentage ownership of the Service Provider. From time to time, the Bank may elect to reduce the Account's fees in recognition of amounts paid by Nations Funds for other services (such as administrative services), but it is not obligated to do so, and the amount of any such fee reduction may vary. The Account will not be charged a sales "load" for buying or redeeming Fund shares described in the accompanying prospectuses.

Such doubletalk-laden form went on to state:

> I acknowledge receipt of the current prospectuses for the Funds and a Nations Funds Fee Disclosure Statement. As co-fiduciary for this account, I understand that the Service Providers will be paid investment advisory and other fees by the Funds. **I approve the method for reducing the investment management fees paid**

19

> **to the Bank by the Account**. I understand and agree that the
> Bank may choose not to reduce the Account's fee on the account
> of the compensation paid by the Funds for other services, but the
> Bank is electing to do so at this time. [Emphasis added].

55.     In fact, the Bank and the lawyers who drafted these documents, including

lawyers for NFT and the NFT Trustees, used such language to conceal the fact that although in

many cases there was a credit for certain of the post-Conversion investment advisory fees to be

incurred by fiduciary accounts, the credits were insufficient to offset the substantially higher

expenses that fiduciary accounts would bear post-Conversion and that the Bank intended to

reduce or eliminate the credit as soon as practicable thereafter once consents were obtained

and/or the Conversions completed.

56.     Further, in many other cases, there was no credit for the fiduciary fees charged by

the Bank. Despite the outward appearance of independence of NFT, the NFT Trustees and their

legal counsel, who may have performed or been involved with the physical tasks of "drafting"

them, the content of the Nations Funds prospectuses was effectively dictated by BAC, the Bank

and the Bank Subsidiaries. Indeed, with respect to the Nations Funds prospectuses used by the

Defendants for the Conversions, Robert Hitpas, a Senior Vice President of the Bank as well as

one who was responsible for overseeing numerous fiduciary accounts including the Kutten

Trusts, found them daunting, full of legalese, fine print and difficult to read. Another Bank

Senior Vice President, Paula Hundt, reacted similarly and it is believed that many, if not most of

the Bank's "trust officers" could not understand many of the material terms of the Conversions

and what was set forth in the prospectuses of the Nations Funds provided to beneficiaries of

fiduciary accounts in connection therewith or otherwise in connection with the purchase of

Nations Funds shares for such accounts.

57. Apparently as a result of an agreement among the Defendants and the senior officers of the Bank Subsidiaries, there was no credit applied to the affected fiduciary accounts for many of the substantial operating expenses of the Nations Funds, which materially reduced the net investment returns to fiduciary accounts, such as the accounts of the Kutten, Crowley, Lubbe and Scharff Trusts. At no place in any of the Nations Funds prospectuses disseminated by the Bank to beneficiaries of fiduciary accounts and to co-fiduciaries in connection with the Conversions did Defendants or their "controlled persons" disclose that, post-Conversion, all fiduciary accounts affected by the Conversions would be forced to bear substantially higher investment-related expense levels post-Conversion than those which preceded it, even allowing for whatever credits the Bank applied to its fees for serving as fiduciary. Similarly concealed by them was the fact that they re-allocated certain expenses incurred by the Nations Funds so that they would not be subject to the "credits" and thus directly borne by the affected fiduciary accounts. Indeed, upon information and belief, most of such credits, to the extent given, have now been substantially reduced on a nationwide basis.

58. Further, the Defendants made no disclosure of the true motives of the Defendants in carrying out the Conversions or the full extent to which they were profiting unjustly there from and, in particular, the benefits that would accrue to them from the additional assets which would flow into the Nations Funds and other proprietary mutual funds, making them more saleable to the investing public generally. Even after the Bank applied a so-called credit against its fees to some fiduciary accounts for some portion of the advisory and administrative fees charged to the Nations Funds, in practical terms, it was (and is) impossible for co-fiduciaries, beneficiaries and others (including the Bank's own "trust officers" and "portfolio managers") to understand and have knowledge of the true cost of ownership of Nations Funds to the fiduciary accounts and the income earned upon their assets. Indeed, plaintiffs Kutten, Arnold, the

21

Medlers and Scharff, as well as other beneficiaries, have sought to obtain such information or other similar information relating to the expenses of investing the assets of fiduciary accounts in the Nations Funds from the Bank and have never received "straight" or any answers to their questions with respect thereto and have received misleading or downright deceptive information as to the impact of such investments upon them and their fiduciary accounts.

59.     Significantly, at no time did the foregoing "disclosure" documents disclose clearly to a co-fiduciary, a beneficiary or other person interested in the affected fiduciary accounts the true additional direct and indirect expenses of the Conversions (although many of such "disclosures" were buried in the Nations Fund prospectuses) nor, in fulfillment of the Bank's fiduciary responsibilities, did the Bank make any personal efforts to insure that Plaintiffs or others similarly situated understood the extent to which the Bank, BAC, their subsidiaries and affiliates would benefit from the Conversions and how the fiduciary accounts would end up paying substantially more for the investment and related services that the Bank had historically supplied in partial consideration for the Bank's trustee and similar fees. Indeed, by way of example, Mr. Fisher's letter of August 31, 2000 sent to beneficiaries of fiduciary accounts transmitting Nations Funds prospectuses was purportedly "for information" only and recipients, including Plaintiffs, were told: "**you do not need to take any action.**" [Emphasized in original].

60.     The Investment Policy Committee ("IPC") of the Bank, the committee charged with evaluating investments for fiduciary accounts, was involved in the decision to approve the Conversions of Common Trust Funds into the Nations Funds. The members thereof knew in advance of the Conversions that the fiduciary accounts affected by the Conversions would be forced to endure materially higher expenses, post=Conversions, than they had previously. Neither the IPC nor the Bank officers on it made any effort to communicate such material facts to affected beneficiaries, either in the documents provided to them in connection with the

22

Conversions or otherwise.

61.     The Bank did not disclose to affected beneficiaries that the Conversions would produce capital gains tax liability. In fact, to the contrary, the Bank advised the beneficiaries that there would no capital gain consequences as a result of the Conversions of the Common Trust Funds into the Nations Funds. The Bank did not disclose that the Conversions would result in a net 20-30 basis point increase at a minimum in the fees and expenses of fiduciary accounts as a result of investments in the Nations Funds. To the contrary, the Bank provided information with respect to the expense ratios for the Nations Funds in the various Nations Funds prospectuses as well as unintelligible information regarding fee credits, but never advised the beneficiaries that their accounts would pay more for Nations Funds investments than they had paid pre-Conversions.

62.     Each affected fiduciary account sustained a minimum increase in fees and expenses of 20-30 basis points (.20-.30%), a fact that was not readily available to members of the Class affected by the Conversions. Given the growth of the Nations Funds mutual funds in the hundreds of billions of dollars, most of which comes from the Bank's fiduciary accounts, and the number of years the Bank has extracted these fees and expenses from the fiduciary accounts, compensatory Class-wide damages are quite substantial and are well in excess of $5 million, exclusive of interest and costs.

63.     The documents provided to members of the Class in connection with the Conversions concealed these material facts and were made with the intent that the persons affected by the Conversions provide their consents thereto.

64.     Moreover, the Bank and/or the Bank Subsidiaries, in presenting a substantial amount of data in the Nations Funds prospectuses and otherwise in connection with the Conversions, failed to present for comparison data on other, non-proprietary mutual funds that

23

would show off the Nations Funds in a favorable light. Thus, members of the Class would have no way of knowing that instead of using low expense ratio, but nevertheless comparable funds generally available in the marketplace, the Bank selected only the Nations Funds for investment of fiduciary assets.

65. Intentional wrongdoing and misconduct toward the Bank's beneficiaries is apparent from the conflict of interest of the Chairman of the IPC. Owen Shell, a former senior executive of Private Bank, testified that Sandy Galt, the Chairman of the IPC in 1999, was also providing advisory services to the Nations Funds. In other words, he was serving two masters. He worked for the Nations Funds and NFT and had an interest in getting approval by the IPC for investments of the Bank's fiduciary assets in the Nations Funds while he was the Chair of the IPC. This conflict was never disclosed to the beneficiaries of the Bank's fiduciary accounts in Nations Funds prospectuses or in any other written form.

66. Upon information and belief, no analyses or determinations were made by the Bank as to the suitability and/or propriety of the relative costs and benefits of investments in the Nations Funds at the time or before the Conversions were carried out as to each fiduciary account, as compared to pre-Conversion investments including, *inter alia*, any comparisons with numerous other available mutual funds or investment vehicles in which the Bank could have invested prudently and at lower cost the funds of these accounts in which Plaintiffs and the members of the Class were beneficiaries.

67. Upon information and belief, neither the Bank, NFT nor the NFT Trustees negotiated the fees and expenses to be charged to the Nations Funds on an arm's-length basis or comparison shopped in any significant way with other funds or families of funds in an attempt to obtain the same or better investment services elsewhere. Upon information and belief, any "comparisons" that were done by the Bank were merely to "paper" the Bank's files so it would

24

appear that an effort was made to consider investments in alternative mutual funds or mutual fund families. Similarly, neither NFT nor the NFT Trustees, sought to obtain the lowest fees from the Bank Subsidiaries actually operating the Nations Funds. Indeed, as stated by New York's Attorney General Eliot Spitzer: "Fund directors do not – and cannot – negotiate hard on the fees." This is particularly the case when, as here, all of NFT's Trustees were nominated and voted upon by the Bank, which totally controlled the composition of NFT's Board and, thus, NFT. By their control of NFT, the NFT Trustees and the Bank Subsidiaries, the Defendants caused false and misleading Nations Funds prospectuses to be disseminated in connection with the offering and sale of Nations Funds shares as described herein.

68.     Upon information and belief, the Bank specifically excluded alternate investment vehicles (such as other non-proprietary mutual funds such as the Vanguard and Fidelity mutual funds and others specifically requested by Plaintiffs the Medlers, Kutten and Arnold) from their considerations in order to maximize their earnings and those of their corporate affiliates (including the Bank Subsidiaries) and did not give serious consideration to leaving the assets of fiduciary accounts invested as they were, pre-Conversion, and/or giving beneficiaries of such accounts a choice as to the various alternatives available, such as were sought by, *inter alia*, Judge Medler. Indeed, only after more than five years of complaints by the Medlers, did the Bank agree to replace the Nations Funds with low expense Vanguard Funds.  Similarly, at no time did the Bank give any consideration to making changes in the Bank's "Common Trust Funds" so as to provide any of the purported "benefits" that the Bank claimed would be forthcoming as a result of the Conversions, such as providing "daily pricing." The requests of Plaintiffs Kutten, the Medlers and Arnold and other beneficiaries of the Bank's fiduciary accounts for changes in investments were repeatedly rebuffed.

69.     The Bank received millions of dollars in purported money management, investment advisory, administrative and other fees as a result of the Conversions, as well as from the investment of fiduciary assets in the Nations Funds generally. The Bank also benefited by receiving Trustee or similar fees for serving as a fiduciary and by reason of the benefits which flowed from, *inter alia,* substantially reduced operating expenses of the Bank's fiduciary operations and bulking up the Nations Funds. Despite these benefits to the Bank and its affiliates, these investments have been of little, if any, benefit for the Bank's fiduciary accounts and the beneficiaries thereof, including Plaintiffs and the members of the Class.

70.     In addition to the documents referred to above, the false and misleading documents disseminated to Plaintiffs and members of the Class include all those form documents used by the Bank in connection with the Conversions and each of form aspects of the monthly or other statements of account provided to the beneficiaries of the Bank's fiduciary accounts. By way of example, the Bank's Account Statement provided to Plaintiff Arnold for the period dated January 3, 2006 to March 31, 2006, in stating: (i) the "Account Investment Objectives" failed to disclose that such "objectives" were determined by the Bank unilaterally to suit its own needs in marketing the Nations (now Columbia) Funds and took no real consideration of Plaintiff Arnold's own needs and wishes and that the Bank, in determining such "objectives" failed to comply with the regulations established by the Comptroller of the Currency in connection therewith; (ii) the assets of the account which were invested in Columbia Funds could have been invested in non-proprietary mutual funds with better investment returns and lower expense ratios and/or if such assets were invested internally by the Bank the investment returns would be higher yet without any incremental expenses being incurred; (iii) the "Assumed Rates of Return" were higher than the actual performance of the specific Columbia Funds in which the assets of the account were invested; the actual rates of

26

return to Plaintiff Arnold's account from the investments in the "Columbia Cash Reserves" were lower than the Bank paid to depositors who walked into its retail branches with no-pre-existing fiduciary relationship; (iv) the "Hypothetical Fees and Expenses" attributed to particular Columbia Funds were understated because they failed to include all of the direct and indirect charges paid for from Plaintiff Arnold's account for such investments; (v) the so-called "Affiliate Disclosure" while generally alluding to potential direct and indirect benefits to affiliates of the Bank conceals the extent and complete nature of such benefits and the exact financial impact on Plaintiff Arnold's account; (vi) the so-called "California Disclosures to Beneficiaries" are nothing more than boilerplate and failed to disclose to Plaintiff Arnold the identity of the Bank's agents and their relationships to the Bank in connection with the transactions referred to in the Account Statement; (vii) the Bank's statement that its "Private Bank...is committed to providing you with customized wealth management solutions" is a fiction when, in fact, the opposite is true and the investments for Plaintiff Arnold's account are determined on a wholesale basis based upon Class-wide investment formulas; and (viii) Plaintiff Arnold and her account have no "Relationship Manager" and, in fact, they are "overseen" by a Call Center in Dallas with interchangeable personnel with little knowledge of the investments made for the account, the relative merits thereof and the expenses incurred in connection therewith as compared with alternative non-proprietary investments.

71.     Each of such documents contains information and statements relating to one or more of the Plaintiffs' fiduciary accounts, including the fees and expenses paid by such accounts, which are materially false, misleading or omitted to state material facts necessary to render such statements true at the times they were made.

72.     Plaintiffs and the members of the Class relied to their detriment on the false statements set forth herein and have suffered damages in an amount to be proven at trial. Had

they not so relied on the honesty and candor of the Bank and not believed in the accuracy and completeness of the written communications from the Bank, they would have sought the resignation of the Bank as corporate fiduciary or pursued their legal rights including the commencement of litigation. Further, had the SEC and the Comptroller of the Currency been informed of the Bank's deception of those entrusted to its care and its misrepresentations and omissions of material facts in connection therewith, such agencies would not have permitted the sale of Nations Funds shares to the Bank's fiduciary accounts.

73.     Upon information and belief, Plaintiffs and all members of the Class suffered damages from the investment practices of the Bank as described above in an amount which cannot presently be determined but which is capable of calculation and they are entitled to restitution of the Bank's unjust enrichment.

## THE SECURITIES AND EXCHANGE COMMISSION

74.     At least one or more of the Bank Subsidiaries identified above are "Financial Advisers" registered as such with the Securities and Exchange Commission (SEC) under the Investment Advisers Act of 1940 as amended, 15 U.S.C. § 80b-1 et. seq., (the "1940 Act") (see paragraph 10 above) and, together with the Defendants and all their "controlled persons" are underwriters, offerors, solicitors of sales and/or selling shareholders of the shares of the Nations Funds that are the subject of this litigation. In connection with the offering and sale of the Nations Funds to members of the Class herein, the Defendants and their "controlled persons" filed with the SEC registration statements and other documents which were false and misleading as indicated herein.

75.     In addition to filing such documents with the SEC, the Bank made application to the SEC for approval of the Conversions. In connection with the Conversions carried out in the year 2000, the Bank filed an application with the SEC prior thereto explaining its purported

28

justifications for the Conversions. In granting its approval thereto, the SEC conditioned its approval of the Conversion upon the Bank's carrying them out in the best interests of the affected beneficiaries. As indicated throughout this Complaint, not only did the Bank fail to comply with the SEC's conditions but concealed this fact from Nations funds prospectuses when offering and selling Nations Funds to Plaintiffs and members of the Class, including the Federal Securities Sub-Class.

76.     For the reasons set forth herein, the across-the-board Conversions of all assets in the Common Trust Funds were not consummated in the best interests of the beneficiaries of the Bank's fiduciary accounts but solely in the Defendants' interests.

## THE COMPTROLLER OF THE CURRENCY

77.     On or about December 16, 2004, the Bank, as a result of certain of the wrongdoing described herein and otherwise, entered into a written agreement with the Office of the Comptroller of the Currency (No. AA-EC-04-35), pursuant to which it agreed to cease and desist such conduct and to effectuate corrective actions to address such conduct. This agreement was signed by, *inter alia,* Messr. Lewis and Hance. Notwithstanding the agreement, the Bank continues to flagrantly breach its obligations there under, including in connection with the purchase of shares of Nations (now Columbia) Funds shares for its fiduciary accounts. Unless further remedial steps are taken, the Bank will continue to not only flout its agreement with the Comptroller of the Currency, but to breach its duties to the beneficiaries of its fiduciary accounts as described herein and otherwise. The Bank failed to disclose to the members of the Class this agreement with the Comptroller and the facts and circumstances which led up to it, either in Nations Funds prospectuses or in any other written form disseminated to members of the Class in connection with their fiduciary accounts.

## CLASS ACTION ALLEGATIONS

78.     Plaintiffs restate and reallege each and every allegation set forth in the

paragraphs above as if stated herein.

79.     Plaintiffs Mary Ann Arnold, the Medlers. and Elsie Mahler Scharff ("Class

Plaintiffs") bring this action on their own behalf respectively, and pursuant to Rule 23(b)(3) of

the Federal Rules of Civil Procedure as a class action on behalf of the following Class:

all beneficiaries, owners, beneficial owners, or principals of trusts, accounts or other
entities for which the Bank or any of its parents, subsidiaries, affiliates, predecessors,
successors or assigns acted as a trustee, fiduciary or agent and that were directly or
indirectly invested in Nations Funds mutual funds at any time from September 8, 1998 to
the present (the "Class").

This Class has already been stipulated to by each of the Defendants, their affiliates and others in

connection with the settlement of certain related claims against them in *In re Mutual Funds*

*Investment Litigation*, MDL-1586, where it was designated as a "Fiduciary Sub-Class". None of

the claims set forth in this Complaint are asserted by members of the Class who have executed

valid and legally binding releases or with respect to those claims barred by the expiration of

applicable statutes of limitations.

80.     The California Sub-Class consists of those members of the Class whose fiduciary

accounts originated in and/or involved beneficiaries residing in California (such as Plaintiff

Arnold). The Missouri Sub-Class consists of those members of the Class whose accounts

originated in and/or involved beneficiaries residing in Missouri (such as Plaintiffs Scharff and

the Medlers, as well as Plaintiff Kutten in her individual capacity). The Federal Securities Sub-

Class consists of all those members of the Class who purchased, through their fiduciary accounts

at the Bank, shares of Nations and Columbia Funds issued pursuant to registration statements

filed with the SEC within the applicable limitations period which claims are not otherwise

barred. The Conversions Sub-Class consists of all those members of the Class who, within the

30

Class Period, have had their fiduciary accounts at the Bank subject to one or more Conversions (collectively, "Sub-Classes"). Such definitions are subject to modification upon completion of discovery with respect thereto.

81. *Numerosity*: The members of the Class and Sub-Classes are so numerous that joinder of all members is impracticable. The exact number of members of the Class and each of the Sub-Classes as above described is not known by Plaintiffs, but is within the sole knowledge of the Bank. Upon information and belief, there were and are at least 70,000 fiduciary accounts (comprised of trusts, estates, retirement accounts and other types of fiduciary accounts), controlled by the Bank with, collectively, more than 100,000 beneficiaries thereof, approximately 10% of which are members of the California Sub-Class and 10% of which are members of the Missouri Sub-Class. These approximations are subject to discovery and the exact numbers of Class and Sub-Class members is readily ascertainable from the Bank's records. Upon information and belief, the members of the Class and Sub-Classes are located in most or all fifty states, and in numerous foreign countries. Similarly, members of the California and Missouri Sub-Classes are located throughout Missouri, California and in many other states.

82. *Commonality*: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class or Sub-Classes. This case is not about the administration of individual fiduciary accounts; rather, the implementation of an across-the-board business decision of Defendants, on a nationwide basis, to invest their fiduciary funds in the Nations and Columbia Funds. The common questions of fact and law, include but are not limited to:

(a) Whether the Bank's business decision to invest assets of its fiduciary accounts in the Nations and Columbia Funds was motivated by the best interests of the Class members (which the Bank had a duty to put before its own) or by Defendants'

31

desire to generate management and investment advisory fees for themselves, their affiliates and subsidiaries, to lower the Bank's expenses of managing fiduciary assets and to generate other benefits for themselves by *inter alia*, "bulking-up" the assets invested in the Nations and Columbia Funds;

(b)     Whether the Bank breached fiduciary duties by failing to conduct its fiduciary operations in conformity with the requirements of the National Banking Act and other applicable law;

(c)     Whether the Bank breached its fiduciary duty by making investment decisions for its fiduciary accounts based upon Defendants' own interests and those of their affiliates, rather than the interests of the beneficiaries of such accounts;

(d)     Whether the Defendants, and those under their control, made misstatements of material fact and omissions of other material facts in connection with the sale of shares of Nations Funds to fiduciary accounts in Nations Funds prospectuses and otherwise as described herein;

(e)     Whether the Bank had a uniform policy of only investing fiduciary accounts in its proprietary funds, rather than other competitive funds in the market place; and

(f)     Whether the Bank trained and employed its Portfolio Managers to routinely and systematically make investments for fiduciary accounts, either wholly or predominantly using the Nations Funds, without disclosing various conflicts of interest;

83.     *Typicality*: The Plaintiff's class claims are typical of the claims of the Class and respective Sub-Classes because the Bank and BAC failed to disclose and or intentionally omitted the information by use of the form letters and disclosures set forth above from each of the Plaintiffs and the members of the Class. Thus, each of the omissions described above applies

32

to each Plaintiff in a manner identical to that of the remaining members of the Class and Sub-Classes. As noted above, a central allegation in this case involves, *inter alia*, the Bank's and BAC's failure to disclose the existence of over-arching conflicts of interest between and among the Class Plaintiffs, members of the Class, the Bank and BAC, NFT and the Bank Subsidiaries, presenting a mixed question of law and fact. Specifically, the Bank's and BAC's failures to disclose material facts included, but is not limited to the following:

(a)     That the foregoing conflicts of interest existed and, to the extent they did, the nature and consequences thereof;

(b)     That the Bank and BAC were, first and foremost, requiring their personnel to invest fiduciary assets in their proprietary mutual funds, thereby increasing revenues and profits to the Bank and its affiliates, at the expense of the beneficiaries whose fiduciary accounts paid the increased incremental expenses of the more expensive Nations Funds; and

(c)     That Bank personnel were not allowed to invest in non-proprietary mutual funds, except in rare and isolated circumstances;

84.     *Adequacy*: The Plaintiffs will adequately and vigorously defend the interests of the Class and prosecute the claims alleged herein on behalf of each of them. Plaintiffs Scharff, the Medlers and Arnold are able to and will fairly and adequately protect the interests of the Class, the Federal Securities Sub-Class and the Missouri and California Sub-Classes, respectively, and Plaintiff Arnold will do the same with respect to the Conversions Sub-Class.

85.     The attorneys for Plaintiffs Scharff, the Medlers and Arnold are experienced and capable in complex litigation. The attorneys for Plaintiffs Scharff, the Medlers and Arnold and the Class will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

33

86.     The relief sought is common to the entire Class including, *inter alia:*

(a)     a judgment that the Bank violated, the federal securities laws, its fiduciary duty
        as Trustee (or other similar fiduciary role) and the Consent Decree with the
        Comptroller of the Currency with respect to the affected fiduciary accounts and
        whether defendant BAC and the "controlled persons" actively participated and
        conspired with the Bank in doing so;

(b)     payment by the Defendants of compensatory damages caused by such breaches
        of fiduciary duty, as well as treble and punitive damages, as appropriate;

(c)     payment by the Defendants of the costs and expenses of this action, including
        Plaintiffs' attorneys' fees;

(d)     an injunction preventing the Bank from opposing petitions by beneficiaries of the
        affected fiduciary accounts seeking to replace the Bank as corporate fiduciary;
        and

(e)     an injunction which establishes appropriate procedures and safeguards within the
        Bank to ensure that the interests of beneficiaries of fiduciary accounts are fully
        protected from wrongdoing such as described herein.

## COUNT I

## VIOLATION OF §§11 OF THE SECURITIES ACT

87.     Plaintiffs, who at all relevant times during their purchases of Nations Funds
shares, were without knowledge of the material misstatement and omissions of material facts set
forth herein, reassert and reallege each and every allegation set forth in the paragraphs above as
if stated herein on behalf of themselves and the Federal Securities Sub-Class and bring this
Count pursuant to Section 11 of the Securities Act, 15 U.S.C. 77k.

34

88.     The claims asserted herein, which are not fraud-based and are distinct from the claims set forth in Count II through VI asserted against BAC, and the Bank whose subsidiaries controlled the issuance of the Nations Funds securities. The claims asserted herein are asserted within the limitations period applicable to Section 11 of the Securities Act in that this action was commenced within one year of the discovery of the material misstatements and omissions contained in the registration Statement being discovered by Plaintiffs and within three years from the sale to Plaintiffs and their fiduciary accounts shares of Nations Funds. Although Plaintiffs had a generalized dissatisfaction with the Bank's performance as a fiduciary and with the ownership of Nations Funds in their accounts generally, they had no particularized factual knowledge that would have put them on inquiry notice of the wrongdoing perpetrated upon them as reflected in such Counts I through VI.

89.     As described above, the Defendants and the "controlled persons" of BAC and the Bank, including the members of the NFT Board, caused Registration Statements and Post-Effective Amendments thereof to be filed with the SEC which contained, *inter alia*, Nations (now Columbia) Funds prospectuses which were disseminated to members of the Federal Securities Sub-Class, which prospectuses misrepresented material facts and omitted other material facts as described herein.

90.     On December 30, 2005 and on other dates relevant hereto, the Defendants and certain "controlled persons" including the NFT Trustees, caused the Nations Funds to file Registration Statements with the SEC as well as Post-Effective Amendments thereto, each of which documents incorporated Nations Funds prospectuses. Each of such Registration Statements and Post-Effective Amendments became effective and, in connection therewith, the Nations Funds sold shares therein through the Bank Subsidiaries as well as other "controlled persons" of BAC and the Bank.

91.     Each of the foregoing Registration Statements and Post-Effective Amendments
and the prospectuses incorporated therein contained untrue statements of material facts and
omitted to state other facts necessary to make the statements made not misleading and concealed
and failed adequately to disclose material facts regarding, *inter alia*: (1) the relationships
between and among the Defendants and the "controlled persons"; (2) the control exercised over
the Nations Funds and the NFT Board by BAC and the Bank, in particular, the Bank's power,
through Nations Funds proxies, to dominate the process pursuant to which the members of the
NFT Board were nominated and elected; (3) the necessity for the fees and expenses charged to
fiduciary accounts as a result of the offering, which would not have been incurred by the
affected fiduciary accounts but for being forced to invest in Nations Funds; and (4) the failure
of the NFT Board to seek asset managers and other providers of services to the Nations Funds
based upon quality and cost, as compared to their relationship to BAC and the Bank, in violation
of 15 U.S.C. 77k..

92.     Further, such Registration Statements and Post-Effective Amendments failed to
disclose that the shares of the Nations Funds registered and sold pursuant thereto were being
sold mostly to fiduciary accounts in the Bank's care, that the Bank, in light of such fact, voted
the majority of the outstanding Nations Funds shares to exercise its total control and domination
of the NFT Board. Additionally, the fact that special classes of Nations Funds shares were sold
to the Bank's fiduciary accounts (e.g. "Trust Class Shares," "Z Shares"), such shares were not
freely tradable and, as such, the Bank's representation as to the Nations Funds portability was
false.

93.     Each of the Nations Funds and Columbia Funds prospectuses purported to
disclose certain risks to the investors in the covered securities. These Registration Statements
and Post-Effective Amendments also failed to disclose that among the risk factors faced by

36

investors in Nations Funds was the risk that, because its Board selected and contracted with the Bank Subsidiaries to provide investment management and administrative services on a "no-bid" basis, Nations Funds were being charged excessive fees for such services and because the NFT Board was not objective in its selection of investment advisers to the Nations Funds, shareholders were not able to obtain the most qualified personnel and the lowest cost consistent with such quality.

94.     By way of example, the Columbia Money Market Funds prospectus dated December 30, 2005 discussed various material risks to be faced by investors at page 5 thereof under the heading "Principal risks and other things to consider." Notwithstanding the risks that were disclosed, such prospectus failed to disclose the material risk that, because of the relatively high expense structure of the Columbia Cash Reserves Fund (and indeed, all Nations/Columbia Funds) as compared with the expenses of the Bank's direct investment of the invested assets, the affected fiduciary accounts would have materially lower yields (i.e.net income) from such investment than if the Bank had invested the assets of these accounts directly in the identical securities bought by the Nations Columbia Cash Reserves Fund.

95.     Similarly, at page 5, *et seq* of such prospectus, in discussing the historical and likely performance and fees and expenses faced and to be faced by investors therein, the Defendants and/or their "controlled persons" failed to disclose therein the true aggregate "Total net expenses" for the shares of the Fund since it did not reflect the net effect of the other charges imposed by the Bank as a fiduciary, which had the effect, even after deduction of so-called "credits" (fee waivers and/or reimbursements) against the Bank's fees, of lowering the net return of the assets invested.

96.     Such prospectus also similarly misrepresented the totality of all fees and expenses borne by the invested assets since, in effect, the Defendants and their "controlled

persons" were "double dipping", even after "credits" applied by the Bank against its direct fees.

97.     The above-referenced prospectus also fails to disclose that the services obtained by the Nations Funds from the Bank Subsidiaries are obtained on a no-bid basis and that the NFT Board specifically excluded from consideration other providers of the same services that are better managed and lower cost.

98.     In discussing "Other Important Information" at p. 39 *et seq*, this same prospectus failed to disclose that this and other Nations Funds were subject to unexplained levels of "Portfolio Transaction Costs", none of which were disclosed therein or otherwise disclosed to the beneficiaries of the affected fiduciary accounts. The prospectus also purported to disclose the inter-relationship between and among the Bank and its affiliates without identifying such "affiliates," how and to what extent they profit from the sale of Fund shares and the operations of the Fund generally.

99.     In discussing "How the Funds are managed" at page 41 *et seq* of the above-referenced prospectus, no disclosure is made of the material fact that despite the purported independence and "disinterestedness" of a majority of the NFT Trustees, the Bank, by its control of the Trustee election process through its abrogation to itself of the proxies rightly belonging to Plaintiffs and members of the Class, in fact controls the Trustees themselves, including having the right to hire and fire them at will.

100.    Similarly, such prospectus omits any reference to the voting of the proxies of the Nations Funds themselves or how or why the Bank exercises and votes the majority of proxies itself and in its own interest, all of which is material to the Bank's absolute control and domination of NFT and the NFT Board.

101.    The prospectus also fails to disclose that the NFT Trustees purport to oversee at least 70 different Nations Funds and, as a result thereof, although there are certain efficiencies

38

and cost savings to such Funds, the net effect is that the NFT Trustees do not have the time or inclination to oversee each of the Funds individually and determine what are the most advantageous contractual arrangements for each of such Funds for the benefit of their respective shareholders, including Plaintiffs and the members of the Class. The Prospectus fails to disclose that the members of the NFT Board have totally abdicated their responsibilities to the Nations Funds and their shareholders in favor of giving control over to officers of the Bank Subsidiaries to run the Nations Funds primarily in the Defendants primary interest. Further, because of the compensation package provided to each member of the NFT Board, which is determined and approved by the Defendants, the members thereof are beholden to them and cannot deal with and do not deal with their fiduciary and other responsibilities objectively.

102. Each of the foregoing misrepresentations and/or material omissions is typical of those of the other Nations/Columbia Funds prospectuses issued and disseminated during at least the last three years in that each of them contain what their drafters regard as common "boilerplate."

103. The Defendants were either directly or through their "controlled persons" underwriters, issuers, offerors, solicitors of sales and or selling shareholders with respect to the Nations/Columbia Funds shares sold under and pursuant to the foregoing Registration Statements and Post-Effective Amendments and/or signers thereof through "controlled persons."

104. Each of such Defendants and their "controlled persons" was capable of and did in fact cause NFT and the Bank Subsidiaries to sell the Nations/Columbia Funds shares issued pursuant to the Registration Statements and Post-Effective Amendments referred to herein.

105. Each of the Defendants and their "controlled persons" were provided with or had unlimited access to the foregoing Registration Statements and Post-Effective Amendments prior to and/or shortly after these documents were filed with the SEC and had the power to prevent

the filing, issuance and dissemination of the prospectuses therein and/or cause the statements therein to be corrected.

106. BAC and the Bank dominated and controlled each of the Bank Subsidiaries and other "controlled persons" and their officers who were the signatories to the foregoing SEC filings, all of which were "controlled persons" under and pursuant to § 15 of the Securities Act. As such, BAC and the Bank were and are responsible for the statements made by or in the name each of the "controlled persons", their officers, including the NFT Trustees as described above. The Defendants, directly and through their "controlled persons" and their respective legal counsel not only participated in the sale of Nations/Columbia Funds shares but participated in the preparation of the false and misleading Registration Statements and Post-Effective Amendments referred to above.

107. As a result thereof, and the scheme of which the issuance and filing with the SEC of the foregoing Registration Statements and Post-Effective Amendments thereto were an integral part, BAC and the Bank, through their "controlled persons" caused Nations/Columbia Funds shares to be issued and sold to Plaintiffs' fiduciary accounts and those of the members of the Federal Securities Sub-Class, all of which was in violation of § 11 of the Securities Act, all of which caused them damages in an amount which cannot presently be determined for which damages each of the Defendants is jointly and severally liable. At the times the Nations Funds shares were issued and sold to Plaintiffs' fiduciary accounts (of which they were beneficial owners), they were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts. Members of the Federal Securities Sub-Class who still hold such shares covered by this Count and have sustained losses thereupon hereby demand that the Bank hereby tender (and they hereby do tender) those shares and seek the recovery of the consideration of such shares. Plaintiffs Kutten, Scharff and the Medlers as

40

well as the remaining members of the Federal Securities Sub-Class seek recissionary damages.

## COUNT II - VIOLATION OF SECTION 12(a)2 OF THE SECURITIES ACT

108. BAC and the Bank offered and sold a security, namely shares of the Nations Funds, using instruments of interstate commerce, by means of oral statements, correspondence and a prospectus (hereinafter "Disclosure Materials"), with an intent that such Disclosure Materials be relied on. The Disclosure Materials contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading, which statements and omissions BAC and the Bank knew, or in the exercise of reasonable care would have known, were false or were material facts which were required to be disclosed to avoid the representations which were made from being misleading.

C. The Bank and BAC are directly liable to plaintiffs under § 12(2) of the Securities Act of 1933 and are also liable to plaintiffs pursuant to § 15 of the Securities Act of 1933, 15 U.S.C. § 77o, as a control person of NFT with respect to the violations of § 12(2) by NFT.

D. Plaintiffs and the other members of the class did not know that the representations made to them by defendants regarding the matters described above were untrue and did not know the material facts which were not disclosed. Plaintiffs discovered these misrepresentations and omissions within one year after the discovery of this wrongdoing.

E. As a result of the matters set forth herein, pursuant to § 12(2) of the Securities Act, plaintiffs and the other members of the Securities Sub-Class class are entitled to rescind their purchases of Nations Fund Trust share and recover from defendants all consideration paid for their respective shares, plus interest.

## COUNT III - VIOLATION OF SECTION 15 OF THE SECURITIES ACT

109.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-86 as is more fully set forth herein.

110.    This Count is brought by plaintiffs pursuant to Section 15 of the Securities Act, 15 U.S.C. 77o on behalf of the Securities Sub-Class.

111.    BAC and the Bank were control persons of NFT with respect to the issuance of Nations Funds shares as well as the Conversion process and the dissemination of false and misleading statements and omissions contained in the Registration Statement and Prospectus. The Bank and BAC had the power to control and influence and did control and influence, directly and indirectly, the decision making of the company. As a result, BAC and the Bank are liable under Section 15 of the Securities Act for NFT's primary violations of Section 11 of the Securities Act.

## COUNT IV - VIOLATION OF §10(b) OF THE EXCHANGE ACT AND RULE 10b-PROMULGATED THEREUNDER

112.    Plaintiffs reassert and reallege each and every allegation set forth in the paragraphs above as if stated herein on behalf of themselves and the Federal Securities Sub-Class. The claims asserted herein are separate and distinct from the non-fraud-based claims asserted in Count I hereof.

109.    As described above, BAC and the Bank, through their "controlled persons" caused the dissemination of false and misleading prospectuses and other documents which concealed material facts and misrepresented other material facts in connection with the purchase and sale of Nations/Columbia Funds shares by and for Plaintiffs and the members of the Federal Securities Sub-Class. Such sales of Nations/Columbia Funds shares were integral to the

42

Defendants' scheme and plan to unfairly and fraudulently extract unjust fees and other income from Plaintiffs and the members of the Federal Securities Sub-Class.

110. BAC and the Bank dominated and controlled each of the Bank Subsidiaries, NFT, the NFT Board and their respective agents and employees, all of which were "controlled persons" under and pursuant to § 20 of the Exchange Act. As such, BAC and the Bank are and were responsible for the statements made by or in the name of NFT, the NFT Trust and the Bank Subsidiaries as described above.

111. Despite the fact that Defendants and each of such other "controlled persons" had a duty to disseminate to Plaintiffs and members of the Federal Securities Sub-Class accurate and truthful information regarding the operation of the Bank's fiduciary accounts and as to the manner in which the Nations/Columbia Funds were operated and selected, the manner in which vendors of investment advisory and other services were selected and the existence of excessive expenses to be borne by the Bank's fiduciary accounts in connection with their ownership of Nations/Columbia Funds shares, such persons failed to fulfill such duty. Each of them carried out the plan and scheme described herein intentionally to enrich BAC and the Bank at the expense of Plaintiffs and the members of the Federal Securities Class. Each misrepresentation of material fact and/or omission of material facts described herein was either made with reckless disregard for, or knowledge of, its false and misleading nature. Further each of the Defendants and their "controlled persons" including, *inter alia*, the NFT Trustees, employed devices, schemes and artifices to defraud, while in possession of material adverse information not available to Plaintiffs and the members of the Federal Securities Sub-Class and engaged in the acts, practices and course of conduct as alleged herein, which included the making of, or the participation in the making of directly or through "controlled persons" untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements

made about the Nations/Columbia Funds, the relationships between and among the Defendants and the "controlled persons" and otherwise, not misleading as set forth above. By so doing, they engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of shares of Nations/Columbia Funds including Plaintiffs and the members of the Federal Securities Sub-Class.

112.    Each of such Defendants and their "controlled persons" had actual knowledge of the misrepresentations and omissions of material facts set forth above or acted intentionally with reckless disregard for the truth. Indeed, Defendants consciously looted the Bank's fiduciary accounts as described herein for their own benefit. Such misrepresentations and/or omissions were carried out knowingly or recklessly for the purpose and effect of concealing the truth from Plaintiffs and members of the Federal Securities Sub-Class in connection with the purchase of shares of the Nations/Columbia Funds for their fiduciary accounts by the Bank. Each of the foregoing misrepresentations and/or material omissions is typical of those of the other Nations Fund prospectuses issued and disseminated during at least the last three years in that each of them contain what their drafters regard as common "boilerplate."

113.    As a direct result thereof, and the manipulative scheme of which the issuance and dissemination of such Nations/Columbia Funds prospectuses, written communications to beneficiaries of the Bank's fiduciary accounts and periodic statements of account were an integral part, the Bank caused Nations/ Columbia Funds shares to be purchased for the beneficial ownership of Plaintiffs and for the members of the Federal Securities Sub-Class, all of which was in violation of § 10b of the Exchange Act and Rule 10b-5 promulgated there under by the SEC, all of which caused them damages in an amount which cannot presently be determined. Had the SEC known of the fact that the foregoing Nations/Columbia Funds Registration Statements and Post-Effective Amendments were false and misleading and

44

prepared in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated there under by the SEC, the SEC would not have declared such Registration Statements effective or permitted the sale of the Nations/Columbia Funds registered thereby to be sold.

## COUNT V - VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT

114. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-86 and Count IV as if more fully set forth herein.

115. BAC and the Bank acted as controlling persons of NFT and its Board of Trustees within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their ownership of the subsidiaries which advised, influenced and controlled the day to day operations of the NFT and/or maintained substantial ownership of the Nations Funds shares equitably owned by the fiduciary accounts, the Bank and BAC had the power to influence and control and did influence and control, directly or indirectly, the decision making of NFT and its Board of Trustees, including the content and dissemination of the Disclosure Materials which plaintiffs contend are false and misleading. The Bank and BAC were provided with or had unlimited access to copies of the Disclosure Materials allege by plaintiffs to be misleading prior to the Disclosure Materials being issued and had the power to prevent the issuance of the Disclosure Materials or cause the Disclosure Materials to be corrected.

116 As set forth above, the Bank and BAC violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Bank and BAC are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Bank's and BAC's wrongful conduct, plaintiffs and other members of the Securities Sub-Class suffered damages in connection with their fiduciary account's purchases of the NFT shares during the Class period.

## COUNT VI - VIOLATION OF §215 OF THE INVESTMENT ADVISERS ACT

114.    Plaintiffs reassert and reallege each and every allegation set forth in the paragraphs above as if stated herein.

115.    The 1940 Act, 15 U.S.C. § 80B-6, entitled "Prohibited transaction by investment advisers," provides in relevant part, "[i]t shall be unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly:

> (a)    To employ any device, scheme, or artifice to defraud any client or prospective client;

> (b)    To engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client;

***

> (c)    To engage in any act practice, or course of business which is fraudulent, deceptive or manipulative."

116.    The 1940 Act reflects a congressional intent to eliminate or at least to expose, all conflicts of interest which might cause an investment adviser -- consciously or subconsciously-- to render advice which was not disinterested. *See SEC v. Capital Gains Research Bureau, Inc.* 375 U.S. 180, 191-192 (1963). As registered advisers, the Bank and BAC, and the RIAs identified in paragraph 10 hereof, by and through the "controlled persons," are bound by a fiduciary duty to each beneficiary of the Bank's fiduciary accounts. Plaintiffs allege that the Bank and BAC were and are *bound* by that fiduciary duty on a Class-wide basis and *breached* that duty on a Class-wide basis.

117.    Pursuant to the 1940 Act, the Bank and BAC and the "controlled persons" were bound by a legally imposed fiduciary duty to act in the best interests of the beneficiaries of the

46

Bank's fiduciary accounts. The Bank and BAC owed Plaintiffs and the Class a duty to act with reasonable care in training and supervising their agents, including those of the Bank Subsidiaries and other "controlled persons", and to ensure that full, honest and adequate disclosure was made to each of their fiduciary clients, co-fiduciaries and the beneficiaries of the Bank's fiduciary accounts.

118. Instead, the Bank and BAC directly and through those acting for them breached their duty by failing to disclose material information to such clients, co-fiduciaries and the beneficiaries of the Bank's fiduciary accounts and operated a program calling for the deployment of their proprietary mutual funds in fiduciary accounts that contaminated its management of fiduciary accounts in its care and its widely advertised "customized portfolio" process. Such conduct included, but is not limited to, the conduct set forth in this Complaint. By such conduct, the Bank and BAC affirmatively breached their duties and conducted their business in a manner that operated as a fraud and deceit upon Plaintiffs and the members of the Federal Securities Sub-Class in violation of the 1940 Act.

119. As a result of Defendants' breaches of the 1940 Act and, in particular, §215 of the Investment Advisers Act as described above, the Bank's clients and the beneficiaries of the Bank's affected fiduciary accounts, who were the victims of this scheme, were damaged and entitled to a damages, including restitution and recovery of all fees and expenses paid in connection with the Bank's scheme. See *Morris v. BAC Securities, Inc.*, 277 F. Supp. 2d 622, 642-645. (E.D. Va. 2003).

## COUNT VII - BREACH OF FIDUCIARY DUTY

120. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

47

121.    Upon information and belief, the Bank's decision to invest the assets of the fiduciary accounts in its care in the Nations Funds was motivated not by the interests of Plaintiffs and the Class members but by Defendants' desire to generate investment advisory and other fees for themselves and the Bank Subsidiaries and, as well, to reduce the Bank's operating expenses and to generate additional revenues by other means derived from the Nations Funds.

122.    Upon information and belief, the Bank failed to consider the Nations Funds' high expense ratios or alternative lower cost families of non-proprietary mutual funds (or deliberately did not do so) or to maintain the *status quo* with pre-existing investments when it invested the assets of fiduciary accounts into shares of the Nations Funds, thus putting its own interests before those of the beneficiaries of fiduciary accounts.

123.    The Bank failed to consider the best interests of the beneficiaries of the affected accounts when it invested their fiduciary assets in the Nations Funds and breached its duty of loyalty to them by putting the interests of itself and its affiliates before the interests of Plaintiffs and the members of the Class.

124.    As a result of, *inter alia*, the Bank's improper wholesale transfer of fiduciary assets held by fiduciary accounts into shares of the Nations Funds, the beneficiaries of the Trusts or other similarly situated accounts for which the Bank was a fiduciary have been damaged in an amount to be determined, but believed to be substantially in excess of $5 million.

## COUNT VIII - PLAINTIFFS' CLAIM FOR PUNITIVE DAMAGES

125.    The conduct of the Defendants was outrageous because of the Defendants' deception, malice and evil motive and reckless indifference to the rights of the Plaintiffs and all others similarly situated in implementing the Conversions and otherwise looting of fiduciary accounts in the Bank's care in that Defendants, their "controlled persons" and their employees:

(a)     Deliberately and knowingly withheld and concealed material information in
        Nations Funds prospectuses and other written communications to the affected
        beneficiaries relating to, *inter alia*, its conflicts of interest and the increased
        expenses they would incur as a result of the Conversions and otherwise, which
        expenses inured to the benefit of the Bank in flagrant violation of the Bank's duty
        of loyalty;

(b)     Deliberately and knowingly changed the investment vehicles historically used by
        the Bank for investment of fiduciary assets to the Nations Funds, specifically to
        "bulk up" the Nations Funds and otherwise generate revenues and profits for the
        Defendants at the expense of the beneficiaries of the Bank's fiduciary accounts,
        all of which conduct was and is in flagrant violation of the Bank's duties of
        loyalty and prudence;

(c)     Deliberately and knowingly failed to properly disclose in Nations Funds
        prospectuses and otherwise to beneficiaries and/or those who established the
        Bank's fiduciary accounts the increased expenses of owning Nations Funds
        shares, the method of the application of fee credits to their accounts to offset such
        additional expenses of Nations Funds investments and other material facts in
        flagrant violation of the Bank's duties of loyalty and prudence and the
        Defendants' obligations under and pursuant to the Securities Act, the Exchange
        Act and the 1940 Act;

(d)     Deliberately and knowingly withheld information that the beneficiaries would
        incur capital gains taxes in connection with the Conversions and/or the
        reorganizations of mutual funds within the Nations Funds while the Bank would

suffer no adverse tax consequence in flagrant violation of the Bank's duties of
loyalty and prudence;

(e)    Deliberately and knowingly took advantage of conflicts of interest and engaged
in self dealing transactions and failed to consider whether such conduct was in
the sole interests of the beneficiaries of the Bank's fiduciary accounts to whom
the Bank owed a fiduciary duty, including the duties of loyalty and prudence and
instead, put their interest in generating revenues and profits for the Bank and
BAC ahead of those to whom the Bank owed fiduciary duties;

(f)    Knowingly and intentionally or as a result of gross negligence or willful fraud
concealed material facts relating to the true expenses to be borne by the Bank's
fiduciary accounts as a result of the Conversions and otherwise by setting forth
deceptive comparisons of the expense ratios of Nations Funds.

126.   As a result of the foregoing egregious conduct, Plaintiffs request that the Court
award them substantial punitive damages to punish Defendants and deter them from continuing
to act as described herein, which conduct is being carried out to the present.

## COUNT IX - AIDING AND ABETTING

127.   Plaintiffs repeat and reallege each and every allegation contained above as if
fully set forth herein.

128.   Upon information and belief, Defendants, NFT, the Bank Subsidiaries and others
presently unknown, as part of a corporate business decision, chose to invest the fiduciary assets
of Plaintiffs and the members of the Class in shares of the Nations Funds as part of the
Conversions and otherwise in order, *inter alia*, to generate investment advisory fees and other
fees for its various affiliates and to "bulk-up" the Nations Funds without regard to whether such

50

investments were prudent and in the best interest of Plaintiffs and the other beneficiaries of fiduciary accounts.

129. The foregoing Conversions of the assets of fiduciary accounts to the Nations Funds was carried out in furtherance of BAC's corporate plan to reduce the Bank's expenses of managing fiduciary assets and increasing BAC's overall direct and indirect profits from fiduciary operations, one of its objectives in consolidating the operations of the Acquired Banks. BAC and the Bank proceeded to carry out the Conversions since they would not merely profit from the Bank's trustee and similar fiduciary fees but "double dip" by generating additional revenues through the Defendants' related asset management businesses, administrative service businesses and otherwise. Additional profit was also generated by adding the assets in the Bank's fiduciary accounts to the Nations Funds following the Conversions, thereby making them more saleable at retail to the investing public. Further, the Conversions created an opportunity for the Bank to avoid the relatively low profitability of managing the fiduciary accounts (and the expenses related thereto) which the Bank had contracted to do when it (and/or its predecessors) agreed to serve as fiduciary thereof, and substitute ever-increasing fee income directly and through its corporate affiliates

130. The Bank's wholesale investment of the assets of the Trusts in the Nations Funds in the Conversions carried out around the country, and otherwise, was a breach of its fiduciary duty to Plaintiffs and the members of the Class, which breach was aided, abetted and/or directed by BAC and its affiliates, including NFT and the Bank Subsidiaries as set forth herein.

131. As a result of BAC's aiding and abetting of Defendant Bank, the beneficiaries of the Trusts or other similarly situated accounts for which the Bank was a fiduciary have been damaged in an amount to be determined by the Court, but believed to be substantial.

## COUNT X - UNJUST ENRICHMENT

132.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

133.    By causing the Bank's fiduciary assets in affected accounts to be invested in the Nations Funds, the Bank and BAC have "double dipped." The Bank and BAC have profited by the Conversions, the investment of fiduciary assets in the Nations Funds generally, and from the subsequent acts described herein, thereby unjustly enriching themselves at the expense of Plaintiffs and the members of the Class and Missouri and California Sub-Classes. Defendants have similarly enriched themselves, their subsidiaries and affiliates by using information regarding the beneficiaries of fiduciary accounts to market through "Relationship" Managers and otherwise various goods and services including credit cards, loans and deposit accounts (and to permit certain customers of the defendants to engage in late trading and other improper practices involving the Nations Funds) from which products and services they have been unjustly enriched.  In Plaintiff Scharff's case, the Bank needlessly obtained a mortgage from itself when the Scharff Trust account had more than sufficient assets to pay for the Grantor's home without a mortgage.

134.    Such "double dipping" was carried out by the Bank and BAC by, *inter alia*, imposing on fiduciary accounts the Bank's fees for acting as a corporate fiduciary, as well as investment advisory fees, and other related charges which, when taken together with all the Nations Funds' expenses, even after so-called credits for certain Nations Funds fees, exceeded the amounts to which the Bank was entitled to payment for, *inter alia*, investment of the fiduciary assets and administration of the underlying fiduciary accounts for which services its trustee or similar fees were intended to cover. Such benefits to the Bank and BAC were exacerbated by the Bank's avoidance of substantial operating expenses by reason of its

52

abdication of its individualized investment and administrative responsibilities owed to the members of the Class and Missouri and California Sub-Classes. The Bank enhanced its profit performance at Plaintiffs' expense by favoring the use of its own Nations Funds and investing in them to increase the Nations Funds' asset bases, and aggrandize its own stature under the guise of allegedly providing more services to participants in its so-called "Private Bank."

135.    Further, upon information and belief, with respect to at least certain of the Trusts for which the Bank has acted as Trustee, the total charges against such Trusts for trustee fees/commissions, advisory fees and other amounts payable by the Trusts exceed the contractual amounts for such charges agreed upon by the creators of such Trusts.

136.    The Defendants have invested the proceeds of the foregoing unjust enrichment and realized additional profits thereupon, all of which should be returned to the Trusts and other similarly affected accounts and/or their beneficiaries, as the Court shall deem appropriate (e.g. a proportionate share of the defendants' profits during the years of misappropriation) pursuant to California Probate Code, Section 166440(a)(1) and otherwise.  Missouri statutes impose strict liability against fiduciaries who "at their sole risk" make investments that are improper such that the Bank is "absolutely liable" to plaintiff Scharff and others in the Missouri Sub-Class for their damages. (§362.550.5  R.S.Mo.).  Plaintiffs and others similarly situated are entitled to recover the Bank's ill-gotten gains and profits there from.

## COUNT XI - VIOLATION OF CALIFORNIA PROBATE CODE

137.    Plaintiff Arnold repeats and realleges each and every allegation contained above as if fully set forth herein. The claims set forth herein are asserted on behalf of the California Sub-Class.

138.    Pursuant to Section 16002 of the California Probate Code, the Bank owes and owed to Plaintiff Arnold and the members of the California Sub-Class, an absolute duty of

loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts solely in the interest of the beneficiaries.

139.    Pursuant to Section 16060 of the California Probate Code, the Bank owes and owed to Plaintiff Arnold and the members of the California Sub-Class a duty of candor.

140.    By acting as alleged herein, the Bank has violated and continues to violate the duties of loyalty and candor it owes and owed to plaintiff Arnold and the members of the California Sub-Class. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to 16400 of the California Probate Code.

141.    Pursuant to Section 16004 of the California Probate Code, the Bank owes and owed to Plaintiff Arnold and the members of the California Sub-Class a duty not to use or deal with Trust property for its own profit, nor to take part in any transaction in which it has an interest adverse to the beneficiary, such as Plaintiff Arnold and the members of the California Sub-Class.

142.    By acting as alleged herein, the Bank has violated and continues to violate the duty not to use or deal with Trust property for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Section 16400 of the California Probate Code.

143.    Pursuant to Section 16040 of the California Probate Code, the Bank owes and owed to Plaintiff Arnold and the members of the California Sub-Class a duty of care that includes the duty to invest Trust assets prudently and with regard to individualized strategy appropriate and productive pursuant to Probate Code Sections 16007 and 16009. Pursuant to Probate Code Section 16014, the Bank is required to apply fully the special skills of a corporate fiduciary, and this duty heightens the duty of care otherwise applicable to it.

144. By acting as alleged herein, the Bank has violated and continues to violate the duties of care and productivity it owes and owed to Plaintiff Arnold and the members of the California Sub-Class. Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Section 16400 of the California Probate Code.

145. Pursuant to Section 16420 of the California Probate Code, Plaintiff Arnold and the members of the California Sub-Class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

146. Pursuant to Section 16440 of the California Probate Code, the Bank is liable to Plaintiff Arnold and the members of the California Sub-Class for actual and punitive damages, attorneys' fees, interest, and such other relief as the Court may order.

## COUNT XII - BREACH OF FIDUCIARY DUTY UNDER CALIFORNIA LAW

147. Plaintiff Arnold repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is brought on behalf of the California Sub-Class.

148. Pursuant to Section 15002 of the Probate Code, the common law of California with respect to fiduciary and trust matters remains the law of the State of California, and Probate Code Section 16420(b) expressly preserves "any other appropriate remedy provided by statute or the common law.

149. Pursuant to the common law of California, the Bank owes and owed to Plaintiff Arnold and each member of the California Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts solely in the best interests of the beneficiaries, i.e. the members of the California Sub-Class.

150. Pursuant to the common law of California, the Bank owes and owed to Plaintiff Arnold and the members of the California Sub-Class a duty of candor.

55

151.    Pursuant to the common law of California, the Bank owes and owed to Plaintiff Arnold a duty not to take part in a transaction in which it had a conflict of interest, as it did and does as described above

152.    By acting as alleged herein, the Bank has violated its fiduciary duties of absolute loyalty and candor owed to Plaintiff Arnold and the members of the California Sub-Class.

153.    By acting as alleged herein, the Bank has violated its fiduciary duty not to participate in transactions in which it had or has a conflict of interest, as it does here.

154.    By acting as alleged herein, the Bank has violated its fiduciary duties of care and productivity it owes or owed to Plaintiff Arnold and the members of the California Sub-Class.

155.    By acting as alleged herein, the Bank has violated its fiduciary duty that it owes or owed to Plaintiff Arnold and the members of the California Sub-Class to take and exercise control over Trust assets.

156.    The Bank and its affiliates have already unlawfully extracted huge sums in the form of fees and other charges assessed against fiduciary accounts, and they will continue indefinitely to extract unlawful fees and other charges from Plaintiff Arnold and the members of the California Sub-Class, in an amount which cannot be presently determined.

## COUNT XIII - VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200

157.    Plaintiffs Kutten and Arnold repeat and reallege each and every allegation contained above as if fully set forth herein. Plaintiffs Kutten and Arnold assert this cause of action in their capacity as private attorneys general on behalf of the members of the general public residing within the State of California and/or whose Trusts originated there and, in the case of Plaintiff Arnold, on behalf of the members of the California Sub-Class.

158. The Bank has engaged in and continues to engage in unfair, unlawful and deceptive business practices, including but not limited to sending representatives from St. Louis, Missouri to meet with Plaintiff Kutten in Northern California, whereby it has conspired with BAC and its affiliates to force the Kutten and other trusts to have their assets re-directed from individually managed accounts and/or so-called "Common Trust Funds" and/or other assets to proprietary mutual funds controlled by the Bank and its affiliates. Said Conversions have resulted in higher total direct and indirect expenses charged to fiduciary accounts than those historically paid to the Bank.

159. By acting as alleged herein, the Bank has violated its duties as a fiduciary, which constitutes breach of trust pursuant to Section 16400 of the California Probate Code.

160. The unlawful acts and practices of the Bank as alleged herein, including violations of Section 16400 of the California Probate Code, constitute unlawful business practices within the meaning of California Business and Professions Code Section 17200, et seq.

161. Unless the Bank is enjoined from continuing to engage in the foregoing unfair and deceptive business practices, Plaintiffs Kutten and Arnold and the other members of the general public residing within the State of California and/or whose Trusts originated in California and the members of the California Sub-Class will continue to be injured and damaged by the Bank's unfair business practices.

162. So as not to be unjustly enriched by its own wrongful actions and conduct, the Bank should be required to disgorge and restore to Plaintiffs Kutten and Arnold and the other members of the general public residing within the State of California and/or whose fiduciary accounts originated in California and the members of the California Sub-Class all monies wrongfully obtained by it as a result of its wrongful conduct, together with interest and profits earned thereon.

57

## COUNT XIV - VIOLATION OF CHAPTERS 456 AND 469 MISSOURI REVISED STATUTES

163.    Plaintiffs Scharff and the Medlers repeat and reallege each and every allegation contained above as if fully set forth herein. The claims set forth in this Count are asserted on behalf of the members of the Missouri Sub-Class.

164.    Pursuant to Mo. Rev. Stat. §469.900 (formerly, 456.520.2), the Bank owes and owed to Plaintiff Scharff and the members of the Missouri Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts solely in the interests of the beneficiaries thereof.

165.    Pursuant to Mo. Rev. Stat. § 469.905 (formerly, 456.905), the Bank owes and owed to Plaintiffs Medlers and Scharff and the members of the Missouri Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts governed by the Missouri law solely in the best interests of the beneficiaries, i.e. the members of the Missouri Sub-Class.

166.    Pursuant to section 469.900, the Bank owes and owed to Plaintiff Medlers and Scharff and the members of the Missouri Sub-Class a duty to exercise reasonable care, skill and caution in investment management decisions, to ascertain facts relevant to the investment and management of trust assets, and a duty to use the special skills and expertise it represented itself to possess when investing and managing trust assets.

167.    By acting as alleged herein, the Bank has violated and continues to violate the duties of loyalty and candor it owes and owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class. Such violations of the Bank's duties as fiduciary constitute breach of trust imposed by Missouri statute.

58

168.     Pursuant to Mo. Rev. Stat 456.8-802 (formerly, §456.570.2), the Bank owes and owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class a duty not to use or deal with fiduciary assets for its own profit, not to take part in any transaction in which it has an interest adverse to the beneficiary, such as plaintiffs Scharff, the Medlers and the members of the Missouri Sub-Class.169.     By acting as alleged herein, the Bank has violated and continues to violate the duty not to use or deal with fiduciary assets for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Missouri statute.170.

Pursuant to section 469.900 et seq., the Bank owes and owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class a duty of care that includes the duty to invest fiduciary assets prudently and with regard to individualized strategy appropriate to each fiduciary account and to each beneficiary thereof, and the duty to make fiduciary assets productive. Moreover, the Prudent Investor Act requires the Bank to apply fully the special skills of a corporate fiduciary, heightening the duty of care otherwise applicable to it.171. By acting as alleged herein, the Bank has violated and continues to violate the duties and productivity it owes and owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class. Clearly the Bank was interested in seizing new opportunities and lining its own pockets at the expense of Plaintiffs Scharff and the Medlers and those similarly situated. Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Missouri law.

172.     The Bank and its affiliates have already unlawfully extracted huge sums in the form of fees and other charges assessed against fiduciary accounts and unless enjoined from doing so, they will continue indefinitely to extract unlawful fees and other charges from the

members of the Missouri Sub-Class, in an amount which cannot be presently determined in violation of §469.907 (formerly, § 456.907).

173. Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

174. The Bank is liable to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class for actual and punitive damages because the Bank acted with reckless disregard for the rights of Plaintiff Scharff, the Medlers' and others' rights, attorneys' fees, interest, and such other relief as the Court may order.

## COUNT XV - BREACH OF FIDUCIARY DUTY UNDER MISSOURI COMMON LAW

175. Plaintiffs Scharff and the Medlers repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is asserted on behalf of the members of the Missouri Sub-Class.

176. Pursuant to the common law of Missouri, the Bank owes and owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts governed by Missouri law solely in the best interests of the beneficiaries, i.e. the members of the Missouri Sub-Class.

177. By acting as alleged herein, the Bank has violated its fiduciary duties of absolute loyalty and candor owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class.

178. By acting as alleged herein, the Bank has violated its fiduciary duty not to participate in transactions in which it had or has a conflict of interest, as it did and does here.

179. By acting as alleged herein, the Bank has violated its fiduciary duties of care and productivity it owes or owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class.

180. By acting as alleged herein, the Bank has violated its fiduciary duty that it owes or owed to Plaintiffs Scharff, the Medlers and the members of the Missouri Sub-Class to take and exercise control over fiduciary assets.

181. Plaintiffs Scharff, the Medlers and the members of the Missouri Sub-class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest as described above.

182. The Bank is liable to Plaintiffs Scharff, the Medlers and the members of the Missouri Sub-Class for actual and punitive damages because the Bank acted with reckless disregard for the rights of Plaintiffs Scharff, the Medlers' and others' rights, attorneys' fees, interest, and such other relief as the Court may order.

## COUNT XVI - INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN BREACH OF FIDUCIARY DUTY AGAINST DEFENDANT BANK AND AIDING AND ABETTING AGAINST DEFENDANT BAC

183. Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

184. The Bank has breached its fiduciary duties to Plaintiff Kutten and her daughters, including the duty of loyalty, and various duties highlighted by the federal regulations issued by the Office of the Comptroller of the Currency in 1996 directed to all national banks that act in a fiduciary capacity, with which the Bank failed to comply[2] in that, the Bank:

---

[2] Plaintiff Kutten asserts no private cause of action there under. Rather, the Bank's failure to comply with them is a fundamental breach of fiduciary duty.

(a) Failed to exercise such specialized care and skill as is required of a fiduciary;

(b) Converted trust assets and their subsequent purchase of the Bank's proprietary mutual funds, the Nations Funds;

(c) Failed to properly diversify investment portfolios of the Trusts, and acting in derogation of the settler's expressed directions, including but not limited to failing to invest assets primarily in securities back by the full faith and credit of the United States Government;

(d) Failed to adopt appropriate policies relevant to self-dealing and conflict of interest as required by and in violation of 12 CFR Part 9;

(e) Failed to preview the prospective account to determine if the account could be properly administered subsequent to the acquisition of Boatmen's Trust Co. by the Bank as required by and in violation of 12 CFR, part 9.6;

(f) Failed to properly invest funds waiting to be invested to obtain yields consistent with a reasonable rate of return as required by and in violation of 12 CFR Part 9.10;

(g) Failed to assign at least two individuals to Plaintiff Kutten's accounts as required by 12 CFR, part 9.13;

(h) Charged excessive fees for fiduciary compensation in violation of 12 CFR part 9.15;

(i) Failed to properly supervise personnel entrusted with the management of Plaintiff Kutten's Trusts assets to ensure implementation of the grantors' expressed directions;

(j)     Failed to make appropriate trades in the equity and bond markets to
        enhance the achievement of the objectives of the Trusts, including failing,
        through neglect, to make trades of any kind for several years;

(k)     Failed to establish a written plan to engage in the sale and marketing of
        Nations Funds to Trusts under its fiduciary control and failed to absorb
        the expenses of establishing a collective investment fund, instead
        charging the beneficiaries, including plaintiff Kutten a fee of not less than
        0.01%;

(l)     Failed to consider and advise the beneficiaries of the adverse tax
        consequences arising from a conversion of trust assets and the subsequent
        purchase of Nations Funds;

(m)     Failed to consider alternative investments in funds whose returns and
        ratings are higher than Nations Funds which has scored low on nationally
        respected ratings;

(n)     Created a wholly owned subsidiary to serve as the sole vendor of its own
        product to Trusts under its fiduciary management and control;

(o)     Failed to resign as Trustee when demanded to do so by plaintiff Kutten,
        citing its need for business income as overriding its performance as a
        fiduciary duty and resigning only after plaintiff Kutten's citation of the
        innumerable occasions when the Bank had breached its duty to plaintiff
        Kutten and the Kutten Trusts;

(p)     Failed to observe the parameters of the instructions with regard to
        conversion issued by the Federal Reserve Bank of the United States in SR
        97-3 (SPE), providing [i]n determining whether to convert common trust

> funds to mutual funds, a banking organization must address the possibility
> that the conversion could result in conflicts between the best interests of
> the organization and the fiduciary." Further, the Federal Reserve noted
> the existence of potential conflicts of interest for a national bank to
> engage in such transactions and the need for management to demonstrate
> that it has determined that the governing trust instrument for each affected
> customer authorizes investment in mutual funds and the mutual funds are
> suitable investments for the particular accounts;

(q) Lost administrative control of Plaintiff Kutten's accounts for an
undetermined period of time in 2202 and 2003, including electronic
access to the accounts and the paper files relating to same; and

(r) Failed to communicate with the Plaintiff Kutten, return her phone calls
and letters and failed to perform as requested by Plaintiff Kutten with
respect to modifying investment strategies consistent with the investment
philosophy that reigned in her family for decades.

185. Upon information and belief, the Bank's decision to invest the assets of the
Trusts in the Nations Funds was motivated not by the interests of Plaintiff Kutten and her
daughters but by BAC's desire to generate investment advisory and other fees for its affiliates
and, indirectly, for itself, as well as to reduce the Bank's operating expenses.

186. Upon information and belief, the Bank failed to consider the Nations Funds' high
expense or alternative lower cost families of mutual funds when it invested the assets of the
Kutten Trusts into shares of the Nations Funds thus putting its own interests before those of the
beneficiaries of fiduciary accounts maintained for the Kutten Trusts.

64

187. The Bank's wholesale investment of the assets of the Kutten Trusts in the Nations Funds was a breach of its fiduciary duty to Plaintiff Kutten and her daughters, which breach was aided, abetted and/or directed by BAC and its affiliates.

188. As a result of, inter alia, the Bank's improper wholesale transfer of fiduciary assets held by fiduciary accounts the Kutten Trusts into shares of the Nations Funds, the accounts of Plaintiff Kutten and her daughters for which the Bank was a fiduciary have been damaged in an amount to be determined by the Court, but believed to be substantial.

## COUNT XVII - INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN BREACH OF CONTRACT

189. Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

190. By means of the acceptance by the Bank and its predecessors of the trusteeship of the Kutten Trusts, the Bank and its predecessors committed to provide to such Trusts complete investment management services of a corporate fiduciary, and render such services on an individualized basis consistent with the goals and objectives of Plaintiff Kutten's parents and the needs of the beneficiaries thereof. As the Bank states: "It is our responsibility to invest the trust assets prudently and profitably according to the grantor's wishes as outlined in the trust document." No grantor of a Trust anticipated or could reasonably foresee that the Conversion would be carried out by the Bank with Trust assets or that the designated fiduciary would be the Bank in its present form. Further, as set forth in those Counts not asserted on behalf of the Class, the Bank ignored the express provisions of the Kutten Trusts with respect to investments and otherwise.

191. Plaintiff Kutten and her daughters were beneficiaries of the Bank's contractual obligations to the creators of the Kutten Trusts and other fiduciary relationships. By abdicating

its responsibilities for individual investment management services and/or through "Common Trust Funds" in favor of the wholesale Conversion of fiduciary assets that the Bank was obligated to provide to the beneficiaries of its fiduciary accounts, and by conducting itself in its present business form, the Bank breached its contractual obligations to plaintiff Kutten, her parents and daughters.

192.  By virtue of the Bank's breach of its contractual obligations to plaintiff Kutten, her parents and her daughters, plaintiff Kutten and her daughters have suffered damages in an amount to be determined by the Court.

193.  The Bank has breached its contractual obligations to plaintiff Kutten and her daughters in their individual capacities as a result of its failure to adhere to the terms of the Kutten family's engagement of the Bank and its predecessors as a fiduciary and plaintiff Kutten as well as her daughters have been damaged.

## COUNT XVIII - INDIVIDUAL CLAIM OF PLAINTIFF BREACH OF CONTRACT

194.  Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

195.  This Count if brought by Plaintiff Kutten as a beneficiary of Trusts originally established with the Boatman's Trust Company, being one of the Banks acquired by and/or merged into the Bank.

196.  Boatmen's Trust Company, as designated corporate Trustee, promised and agreed to the settlers of the Kutten Trusts and its beneficiaries to deliver personalized fiduciary services. Implicit in the contractual fiduciary relationship between the Plaintiff Kutten's parents and Boatman's Trust Company was the provision of a full range of personalized fiduciary services, including individualized investment management.

66

197. The Bank, by eliminating the personalized fiduciary services to plaintiff Kutten, including, *inter alia*, individualized investment management, materially breached the explicit and implied terms of the Kutten Trusts, including, but not limited to the following:

> (a) Failing to provide appropriate trained personnel to supervise and monitor the performance of the assets in their charge, including failing to invest in appropriate asset classes;

> (b) Bouncing plaintiff Kutten to poorly manned and anonymous "Call Centers" with whom these was no pre-existing relationship, trust and fealty;

> (c) Changing without plaintiff Kutten's consent representatives of the Bank to deal with plaintiff Kutten who had no knowledge of plaintiff Kutten or the purposes for which the Kutten Trusts were established; and

> (d) Continuing to charge excessive fiduciary fees when failing to perform the services the services that Boatman's Trust Company had agreed to perform.

198. Because the transfer of fiduciary responsibilities from Boatman's Trust Company substantively and materially affected the Kutten Trusts' pre-existing fiduciary relationship with the Bank, it was obliged to give notice to plaintiff Kutten of, inter alia, the terms of the merger between it and Nations Bank, the forthcoming changes in the relationship and provide to them the opportunity to seek a replacement Trustee.

199. Although not provided with said notice, plaintiff Kutten sought the resignation of the Bank in early October, 2003. In response, on October 17, 2003, the Bank incredibly insisted that they be allowed to remain a trustee:

67

> The (Bank's) Committee decided that they would not resign from these trusts. It was a business decision that was based on the fact that Bank of America does not want to give up your business. Bank of America, like everyone else, has felt the effects of the poor economy and has become very reluctant to voluntarily resign as trustee.

200.    The Bank continued to resist resignation until plaintiff Kutten's counsel wrote a seven page letter citing the many examples of the Bank's breach of duties in the administration of the trusts of plaintiff Kutten and her daughters.

## COUNT XIX - INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN UNJUST ENRICHMENT

201.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

202.    By reason of Defendant BAC's causing the Bank's fiduciary assets in affected accounts to be invested in the Nations Funds, the Bank and BAC have "double dipped." The Defendants have profited by the Conversion and the subsequent acts described herein, thereby unjustly enriching themselves at the expense of Plaintiff Kutten and her daughters. Defendants have similarly enriched themselves, their subsidiaries and affiliates by using information regarding the Plaintiff Kutten to market various goods and services including credit cards, loans and deposit accounts, from which products and services they have been unjustly enriched.

203.    Such "double dipping" was carried out by the Bank and BAC by imposing on Plaintiff Kutten's accounts the Banks' fees for acting as a corporate fiduciary as well as investment advisory fees, and other related charges which, when taken together with all the Nations Funds' expenses, even after so-called credits for certain Nations Funds advisory fees, exceeded the amounts to which the Bank was entitled to payment for, *inter alia*, investment of the fiduciary assets, for which services its Trustee or similar fees were intended to cover. Such benefits to the Bank and BAC were exacerbated by the Bank's avoidance of substantial

operating expenses by reason of its abdication of its individualized investment responsibilities owed to Plaintiff Kutten and her daughters. The Bank enhanced its profit performance at Plaintiff Kutten's expense by favoring the use of its own Funds and investing in same to increase its own asset base, and aggrandize its own stature under the guise of allegedly providing more services to participants in its "Private Bank." The Bank's objectives were clear from its telling press release in July 14,1999:

> United by the merger of Bank of America and NationsBank, Nations Banc Investments, Inc., and BA Investment Services, Inc., became one brokerage company on July 12. The birth of Banc of America Investment Services, Inc., the new name for the retail brokerage, gives investors a powerful ally within the Bank of America franchise.

204. The Defendants have invested the proceeds of the foregoing unjust enrichment and realized additional profits thereupon, all of which should be returned to the Kutten Trusts as the Court shall deem appropriate (e.g. a proportionate share of the defendants' profits during the years of misappropriation). Missouri statutes impose strict liability against fiduciaries who "at their sole risk" make investments that are improper such that the Bank is "absolutely liable" to plaintiff Kutten for their losses. §362.550.5 R.S.Mo. Plaintiff Kutten and her daughters are entitled to recover the Bank's ill-gotten gains and profits.

## COUNT XX - INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN VIOLATION OF CHAPTER 456 MISSOURI REVISED STATUTES

205. Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

206. Pursuant to Mo. Rev. Stat §456.900, et. seq., (formerly, 456.520.2) the Bank owes and owed to plaintiff Kutten and her daughters an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts solely in the interests of the beneficiaries thereof.

69

207. Pursuant to Mo. Rev. Stat. §469.905 (formerly, § 456.905), the Bank owes and owed to Plaintiff Kutten and her daughters an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Kutten Trusts governed by the Missouri law solely in the best interests of the beneficiaries.

208. Pursuant §456.900, et. seq, the Bank owes and owed to Plaintiff Kutten and her daughters a duty to exercise reasonable care, skill and caution in investment management decisions, to ascertain facts relevant to the investment and management of trust assets, and a duty to use the special skills and expertise it represented itself to possess when investing and managing trust assets.

209. By acting as alleged herein, the Bank has violated and continues to violate the duties of loyalty and candor it owes and owed to Plaintiff Kutten and her daughters. Such violations of the Bank's duties as fiduciary constitute breach of trust imposed by Missouri statute.

210. Pursuant to §456.8-802 (formerly, §456.570.2), the Bank owes and owed to Plaintiff Kutten and her daughters a duty not to use or deal with fiduciary assets for its own profit, not to take part in any transaction in which it has an interest adverse to the beneficiary, such as plaintiff Kutten and her daughters.

211. By acting as alleged herein, the Bank violated the duty not to use or deal with fiduciary assets for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Missouri statute.

212. Pursuant to §456.900, et. seq, the Bank owes and owed to Plaintiff Kutten and her daughters a duty of care that includes the duty to invest fiduciary assets prudently and with regard to individualized strategy appropriate to each fiduciary account and to each beneficiary

70

thereof, and the duty to make fiduciary assets productive. Moreover, §456.900, et. seq, requires the Bank to apply fully the special skills of a corporate fiduciary, heightening the duty of care otherwise applicable to it.

213.    By acting as alleged herein, the Bank has violated the duties and productivity it owed to Plaintiff Kutten and her daughters. Clearly the Bank was interested in seizing new opportunities and lining its own pockets at the expense of Plaintiff Kutten and her daughters. Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Missouri law.

214.    Plaintiff Kutten may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

215.    The Bank is liable to Plaintiff Kutten for actual and punitive damages because the Bank acted with reckless disregard for Plaintiff Kutten's rights, attorneys' fees, interest, and such other relief as the Court may order.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Arnold, Medler and Scharff respectfully request on their own behalf, and on behalf of all members of the Class and the Sub-Classes identified above, and Plaintiff Kutten requests on behalf of herself, and her daughters for an order:

(a)    Certifying this action as a Class Action and appointment of Class Plaintiffs and their counsel to represent the Class and the various Sub-Classes;

(b)    Entering judgment on the claims for breach of fiduciary duty in favor of Plaintiffs individually and Class Plaintiffs Arnold, Medler and Scharff as representatives of the other members of the Class and Sub-Classes and against the Defendants of their compensatory damages, treble damages as appropriate

71

and punitive damages in favor of Plaintiffs individually and as representatives of
the other members of the Class and Sub-Classes and against the Defendants in
the amount of damages caused by the Defendants' breaches of fiduciary duties;

(c)     Entry of judgment on the claims for breach of contract in favor of Plaintiff
Kutten in the amount of damages caused by the Bank's breach of contract;

(d)     Entry of judgment enjoining the Bank from opposing any petition filed by any
member of the Class or Missouri or California Sub-Classes seeking the removal
of the Bank as corporate fiduciary and requiring the Bank to pay for all legal fees
and expenses incident thereto including its own;

(e)     Entry of judgment compelling the Defendants to account for their unjust
enrichment and disgorging the amount thereof (and the profits earned thereupon)
to the fiduciary accounts, including the Kutten, Crowley, Lubbe and Scharff
Trusts, affected by the wrongdoing described herein and/or their beneficiaries, as
appropriate;

(f)     Entry of judgment compelling the Bank to fully insulate its fiduciary operations
from all of its other business activities and those of BAC and the various
"controlled persons";

(g)     Entry of judgment compelling the Bank to establish and implement procedures
to fully protect the interests of the members of the Class including, *inter alia*, the
appointment of an ombudsman to oversee the Bank's fiduciary operations;

(h)     Repayment to the affected Nations Funds of the damages caused to them by the
Defendants' actions as described herein or failing that to the members of the
Class who indirectly sustained damages;

(i)     Pre-judgment and post-judgment interest at the maximum rate allowable by law;

(j)     Reasonable attorneys' fees and reimbursement of the reasonable costs and

        expenses of prosecuting this litigation and distributing the recovery to members

        of the Class and the various Sub-Classes; and

(k)     Such other or additional relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

June 14, 2006

                     GREENFIELD & GOODMAN LLC
                     RICHARD D. GREENFIELD
                     7426 Tour Drive
                     Easton, Maryland
                     (410)745-4149
                     (410) 745-4158 (Fax)
                     Lead Counsel for Plaintiffs and the Class


                     SUMMERS, COMPTON, WELLS & HAMBURG
                     PROFESSIONAL CORPORATION

                     /s/ Steven M. Hamburg
                     STEVEN M. HAMBURG          #3313
                     HOLLY M. MCINTYRE          #112203
                     8909 Ladue Road
                     St. Louis, MO 63124
                     (314) 991-4999
                     (314) 991-2413 (Fax)

                     RICHARD A. LOCKRIDGE
                     W. JOSEPH BRUCKNER
                     GREGG M. FISHBEIN
                     LOCKRIDGE GRINDAL NAUEN PLLP
                     Suite 2200
                     100 Washington Avenue South
                     Minneapolis, MN 55401
                     (612) 339-6900
                     (612) 339-0981 (Fax)

73

GANCEDO & NIEVES LLP
Hector G. Gancedo
Amy M. Boomhouwer
144 W. Colorado Blvd.
Pasadena, CA 91105
(626) 685-9800

COUNSEL FOR PLAINTIFFS AND THE CLASS

495323