**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ELLEN JANE KUTTEN,** individually, and on behalf of her daughters | ) ) ) ) | |
| and | ) ) | **Case No.  4:06 CIV 0937 (PAM)** |
| **MARY ANN ARNOLD**, **ELSIE MAHLER SCHARFF,** **JOHN F.MEDLER, JR.,** **MICHAEL R. MEDLER, and** **JEFFREY P. MEDLER,** on behalf of themselves, and all others similarly situated, | ) ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) ) | |
| **BANK OF AMERICA, N.A.** | ) ) | |
| and | ) ) | **CLASS ACTION** |
| **BANK OF AMERICA CORPORATION,** | ) ) | |
| **Defendants.** | ) | |

## AMENDED COMPLAINT

COME NOW Plaintiffs Ellen Jane Kutten, individually on behalf of herself, and her daughters, Alessandra Kutten Cottrell and Louise Kutten Cottrell, and Mary Ann Arnold, Elsie Mahler Scharff and John F. Medler, Jr., Michael R. Medler and Jeffrey P. Medler (hereinafter Medlers), for themselves and for all other members of the Classes hereinafter described, by and through counsel, and state and allege as follows:

## OVERVIEW

1.      This Class Action is brought by Plaintiffs Mary Ann Arnold, Elsie Mahler Scharff and the Medlers on behalf of themselves, and all others similarly situated, and by Plaintiff Ellen Jane Kutten, individually, on behalf of herself and her daughters, all of whom are or were beneficiaries of fiduciary accounts for which the Defendant Bank of America N.A.

("Bank") serves or served as corporate trustee.

2.      The allegations in this Complaint are directed at the Bank, as well as its parent
company, Bank of America Corporation ("BAC"), for their breaches of fiduciary and
contractual duties owed by them to beneficiaries of fiduciary accounts arising from the
Defendants' pervasive self-dealing in the context of the Bank's relationship with such
beneficiaries, the Plaintiffs herein, as well as failing to provide to them and the members of the
Class the fiduciary services to which they were and/or are entitled. Such self-dealing included,
*inter alia*, the investment of the assets of the Bank's fiduciary accounts in its captive and
proprietary mutual funds, the Columbia Funds (formerly known throughout most of the relevant
period as the "Nations Funds") and, as to many of these accounts wholesale re-direction of the
assets therein from their historic allocations in in-house, fee-free Common Trust Funds and
individual investments to  the Nations Funds (hereinafter, "Conversion"), which were
controlled, serviced and advised by the Bank's affiliates and  subsidiaries and indirectly by
Defendant BAC.

3.      This Complaint is not pre-empted by the Securities Litigation Uniform Standards
Act (SLUSA) in that the claims asserted herein are not state law claims made "in connection
with" the purchase, sale or holding of a security.  No claims are asserted herein, directly,
indirectly or by implication, under the federal securities laws or any state securities laws. The
Plaintiffs and members of the putative Class are not and have not been purchasers, holders or
sellers of securities and have never had any control over the investments made for their
respective fiduciary accounts.  The Bank is and always has been the record purchaser, owner,
holder and seller of such shares. The Plaintiffs and members of the Class have and had no ability
to make decisions with regard to the securities purchased or held by the Bank for their fiduciary
accounts for which the Bank served as corporate fiduciary and the Bank is the legal owner

thereof.  Indeed, the Bank rejected the Plaintiffs' attempts (as well as those of co-fiduciaries) to have any role in the selection of investments for fiduciary accounts. None of the claims herein are based upon any  alleged omissions or misrepresentations by the Defendants to Plaintiffs nor were Plaintiffs induced by an omission or a misrepresentation to act  "in connection with" the purchase or sale of a security.  Instead, the purchases of Nations Funds shares as described herein were made in furtherance of the Bank's failure to perform its fiduciary duties owed to Plaintiffs and the members of the Class.  Although SLUSA provides for dismissal of **certain** putative class actions based on state law alleging untrue statements or omissions of material facts made "in connection with" the purchase or sale of a covered security, SLUSA does not pre-empt the claims asserted herein as no statements or omissions had any impact whatsoever on the purchase or sale of a covered security; i.e. the shares of the Columbia and Nations Funds purchased by the Bank.  Rather, the statements and omissions alleged herein are directly related to the failure of the Bank to faithfully and forthrightly perform the fiduciary duties it owed to Plaintiffs and the members of the Class.  That the Bank chose to self-deal in its captive proprietary mutual funds is of no moment and does not turn this breach of fiduciary claim into SLUSA pre-empted securities litigation, notwithstanding the Bank's position to the contrary. Because it chose to self-deal in its proprietary funds, the Bank's conduct should not be immune from judicial scrutiny.[1]

## THE PARTIES

4.      Plaintiffs are present or former beneficiaries of the Bank's fiduciary accounts whose assets were invested by the Bank in its in-house proprietary mutual funds, known variously as the Nations Funds or Columbia Funds ("Nations Funds").

---

[1] In challenging Plaintiffs' original Complaint herein, Defendants  concede that Plaintiffs would have no standing to bring a securities claim because they did not "actually" purchase the mutual fund shares. (*See* Bank's Memorandum

5.      Plaintiff Ellen Jane Kutten is a California citizen who has varying interests as beneficiary, contingent beneficiary, as well as co-trustee of several trusts which had been, until the fall of 2003, managed and controlled by the Bank, its corporate parent and affiliates.  In particular, Plaintiff Kutten is a named beneficiary under trusts created by her parents in this District in 1981, as amended in 1983, 1987 and 1990, namely, the Joseph Kutten Indenture of Trust and the Carolyn J. Kutten Indenture of Trust.  In addition, Plaintiff Kutten and her daughters were beneficiaries of trusts established in 1989, namely, the Joseph Kutten and Carolyn Y. Kutten 1989 Grandchildren's Trust (collectively referred to hereinafter as the "Kutten Trusts"). The Kutten family's relationship with the Bank and its predecessors, including her grandfather, noted St. Louisan and philanthropist, Charles H. Yalem, spans a period in excess of forty years.

6.      Plaintiff Mary Ann Arnold is a Nevada citizen who has varying interests pursuant to a Trust established under California law by her grandfather, John T. Crowley, through his Last Will and Testament ("the Crowley Trust"), including her status as a beneficiary thereof, said Trust having been managed and controlled by the Bank, its corporate parent and affiliates.

7.      Plaintiff Elsie Mahler Scharff is a Missouri citizen who has varying interests pursuant to the Nicholas Scharff Trusts and the Pauli R. Scharff Revocable Trust established under Missouri law, including her status as a beneficiary thereof, said Trusts having been managed and controlled by the Bank, its corporate parent and affiliates.

8.       Plaintiff Medlers are Missouri citizens who are beneficiaries of certain testamentary trusts established in Missouri under the Last Will and Testament of Frances B. Lubbe, deceased (the "Lubbe Trusts"), said trusts having been managed and controlled by the Bank, its corporate parent and affiliates.

of Law In Support of Motion to Dismiss, page 10.)

9.       Defendant Bank is a federally chartered bank, deemed a citizen of North

Carolina, and a wholly owned subsidiary of BAC.

10.       BAC is a financial holding company and the parent of the Bank.  BAC is

domiciled in North Carolina and incorporated in Delaware.  At all relevant times, BAC dictated

and controlled the business activities of the Bank, including, *inter alia*, the business activities

described herein and occurring within this District, and wherever in the United States the Bank,

BAC and/or their respective predecessors conducted business.

11.       BAC owns and controls, either directly or through the Bank, various other

entities which controlled and directed the activities of the Nations Funds Trust (hereinafter,

"NFT" n/k/a Columbia Funds Series Trust) during the relevant time period.

12.       At all relevant times herein, the Bank was Successor Trustee of the Kutten

Trusts, the Crowley Trust, the Lubbe Trusts and the Scharff Trusts.  The Bank and the Hon.

Mary Ann L. Medler are currently the Co-Trustees of the Lubbe Trusts.  The Bank is also the

Trustee or serving in another fiduciary role, with respect to the other Trusts or other fiduciary

accounts of which the remaining members of the Class defined below are beneficiaries.  The

non-Bank co-Trustees are not necessary parties to this action as the Bank is the party ultimately

responsible for any breach of duty. See, *Jennings et. al. v. Pierce,* 1995 U.S. Dist LEXIS 2385

(N.D. Ill); *Ramsey v. Boatmen's First National Bank of Kansas City, N.A*., 914 S.W.2d 384 (Mo.

App. W.D. 1996) *In re The Estate of Merrill W. Chrisman,* 746 S.W.2d 131 (Mo. App. E.D.

1988).  The Bank controls and controlled all investment decisions made on behalf of the

fiduciary accounts of Plaintiffs and all members of the Class.

## JURISDICTION AND VENUE

13.       This Court has jurisdiction over the subject matter of this action pursuant to the

Class Action Fairness Act of 2005 and 28 U.S.C. § 1367.  The value of the relief sought on

behalf of Class members exceeds $5,000,000, exclusive of interest and costs.  Further, there is diversity of citizenship between Plaintiffs, citizens of Missouri, Nevada and California, and each of the Defendants, who are citizens of other states.   In addition, as set forth below, Plaintiff Kutten has sustained damages in excess of $75,000, exclusive of interest and costs and, separately, has accrued recoverable attorneys' fees in excess of $75,000.

14.     The claims of Plaintiff Kutten have a value of not less than $1,150,368, excluding attorneys' fees relating to this action, consisting of attorney fees and fees paid to the Bank relating to the resignation of the Bank as Trustee; losses from investments; excess fees; and, repeated and continuing failures to invest according to the terms of the written instrument, which are set forth more specifically in Counts 13 to 18 hereof.

15.     In addition to the foregoing claims, Plaintiffs Kutten, Scharff and the Medlers assert claims under and pursuant to Missouri law, Chapter 456 (Missouri Uniform Trust Code) RS Mo. which also provide for, *inter alia,* payment of their counsel fees.  (Section 456.10-1004 RS Mo. 2005). To date, such Plaintiffs' counsel fees exceed $75,000, exclusive of interest and costs.

16.     The Defendants' breach of their fiduciary and contractual duties to Plaintiffs occurred within and from this District.  The breaches alleged herein resulted from the Bank's strategy and business plan to become a nationwide financial institution as set forth herein.  This Court has personal jurisdiction over the Defendants given their systematic, repeated and continuing contacts with and within this District with Plaintiffs and members of the Class as described herein.

17.     Although the Bank and BAC now have their principal places of business in Charlotte, North Carolina, they conduct substantial business within this District in many locations through the Bank's "Private Bank" and numerous retail branches.

18.     In light of the foregoing substantial contacts with this District, each Defendant can reasonably be expected to be subject to the jurisdiction of this Court, particularly since Plaintiffs' claims as asserted herein specifically arise from and are directly related to the Defendants' contacts with this District as described above.

19.     Venue is proper under 28 U.S.C. §1391(a) in this District because many of the acts and practices complained of herein had their origin in and/or occurred in substantial part in this District. Further, many significant witnesses to the wrongdoing alleged herein are found in and/or did business within this District and will only be available for trial purposes in this District. Plaintiffs Scharff and the Medlers reside in this District, as do many members of the Class. The trusts established for the benefit of Plaintiff Kutten and her daughters originated in and were "administered" in substantial part from within this District. In addition, a substantial amount of documents relevant to the claims asserted herein including, in particular, documents relating to the sale of Nations Funds to Plaintiffs and numerous other beneficiaries of the Bank's fiduciary accounts are located in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### A.     *The Bank's' Drastic Curtailment of Fiduciary Services*

20.     Over the course of more than 15 years, the Bank and BAC made numerous acquisitions of other financial institutions throughout the United States, making the Bank one of the largest financial service providers in the world.

21.     The acquisitions were part of the Bank's business plan pursuant to which many of the investment-related and other personal services to beneficiaries of fiduciary accounts as described herein, would be eliminated, thereby decreasing the Bank's costs of handling said accounts, while increasing the profits generated therefrom. As it recently proclaimed, the Bank "has strategically redeployed capital [shifting the focus of its business from loans to fee-based

7

products and services] to build higher-return, higher-growth, fee-based client relationships" such as those which are the subject of this litigation.

22.     In executing its  decision to decrease its operating expenses, the Bank required the centralization and streamlining of fiduciary services offered by the Bank, including the increased use of its proprietary funds, the Nations Funds, as a "cookie cutter" investment vehicle for investment of the Bank's fiduciary assets and the use of so-called regional "Call Centers" staffed by relatively low-level employees rather than experienced trust officers.

23.     Over the years, the Bank and its corporate predecessors swallowed-whole the St. Louis-based Boatmen's Trust Company, and numerous other Acquired Banks, which had fiduciary responsibilities to Plaintiffs and members of the Class.

24.     After the Acquired Banks were merged into the Bank, the interests of Plaintiffs and members of the Class were not represented by caring, knowledgeable trust officers, but were frequently "serviced" by "Call Centers" in Dallas and Atlanta, as well as elsewhere.  These "Call Centers" are manned by Bank personnel with little or no investment expertise, who employ impersonal computerized asset allocation programs designed to maximize the use of the Bank's proprietary mutual funds. Except for the highest net worth fiduciary accounts, the "customized recommendations" and "wealth management expertise" promised by the Bank in its advertisements are fictions and have been fictions since the consolidation of the various Acquired Banks began taking place.

25.     Joseph Kutten and Carolyn Yalem Kutten (parents of Plaintiff Kutten), in entrusting their assets to Boatmen's Trust Company in St. Louis, a local bank, did so based upon personal relationships with officers of Boatmen's, and its predecessors in interest, St. Louis Union Trust Company and Centerre Bank, built over many years. The fiduciary relationship was established because, *inter alia*, Boatmen's Trust Company and its predecessor banks, held itself

out to Joseph and Carolyn, and to other prospective customers of fiduciary services, as institutionally and personally suited not only to the stewardship of their assets over multiple generations, but looking after their descendants, such as the Plaintiffs in this litigation. Similarly, the grandfather of Plaintiff Arnold, John T. Crowley, through his Last Will and Testament, entrusted his bequeathed assets to a local bank in California. The successor Trustee was a corporate predecessor of the Bank, since acquired by a series of banks, now part of Bank of America.  Plaintiff Scharff's father, Nicholas Scharff, and mother, Pauli Scharff, entrusted their assets to Boatmen's Trust Company, as did the grandmother of the Medlers.

26.     At or prior to the time that Boatmen's Trust Company was acquired by the Bank's predecessor, Nations Bank, it was known by the parties to the acquisition negotiations that the successor entity (i.e. Nations Bank) would materially adversely affect the administration of the fiduciary accounts of  plaintiffs Kutten, Scharff and Medler and all other Boatmen's fiduciary accounts. Similarly, this was the plan of the Defendants with respect to each of the Acquired Banks and their fiduciary functions.

27.     To the best of the knowledge, information and belief of Plaintiffs Kutten, Scharff, and the Medlers, neither Boatmen's nor Nations Bank provided to them or other interested parties in connection with other fiduciary accounts venued in Missouri, appropriate written notice as provided in §362.331 R.S.Mo. of Boatmen's transfer of fiduciary capacities to Nations Bank.  In connection with the transfer of fiduciary responsibilities, and in violation of its fiduciary duty, the Bank did not disclose all material facts, including that the transfer would have a material adverse affect on such interested parties (including Plaintiffs Kutten, Scharff and Medlers and members of the Missouri Sub-Class) that they had a right to object to the transfer and, *inter alia*, obtain a replacement fiduciary.

28.     Plaintiffs believe and therefore allege that the Bank similarly failed to provide

such notice in each of the other instances where the fiduciary responsibilities of an Acquired Bank were taken over by the Bank or one of its predecessors.  As such, all similarly affected beneficiaries were wrongly denied notice and the right to object to a transfer of fiduciary responsibilities to the Bank.

**B.**     ***Nations Funds***

29.     The Nations/Columbia Funds consist of a "family" of more than 70 mutual fund portfolios, which are proprietary funds of the Bank. The Nations Funds' portfolios cover a wide variety of investment disciplines, strategies and types of asset categories including, *inter alia*, the Nations Municipal Income Funds, the Corporate Bond Portfolio; the Nations Small Company Fund; Nations Large Cap Index Funds and Nations Cash Reserves.

30.     The Nations Funds are operated by a controlled entity established by the Bank, Columbia Funds Series Trust, formerly known as Nations Funds Trust ("NFT") and its Board of Trustees.  The Bank, as the largest single shareholder of record of the various Nations Funds, votes for and controls all nominees to the NFT Board.[2]

31.     At all relevant times, the Bank's fiduciary accounts were held captive by the Bank and it was either impossible or relatively difficult to replace it as corporate fiduciary. In virtually all instances where beneficiaries sought the replacement of the Bank as corporate fiduciary, the Bank made such replacement difficult and expensive. While in near absolute control of these accounts, and as an integral part of its plan to reduce the expenses of fiduciary operations and generate additional profits from the fiduciary accounts, the Bank proceeded with

---

[2]  That the Bank totally controlled NFT and its Board was recently evidenced by its firing of William Carmichael, Chairman of NFT's Board and replacement of most other Board members in the wake of a scandal involving the misuse of the Nations Funds by certain of the Bank's favored business customers, the primary victims thereof being the members of the Class herein. As part of a $675 million settlement of claims by the SEC and the New York Attorney General, the Bank, its subsidiaries and senior officers made a mockery of the independence of the NFT Board when they unilaterally agreed to make certain changes in the governance of NFT and the operation of the Nations Funds without consultation with NFT's Board.

the Conversions. This allowed the Bank to funnel the assets in its captive fiduciary accounts into shares of the Nations Funds.  All of the Conversions were carried out on a wholesale basis without giving consideration as to whether the Conversions were prudent and in the beneficiaries' best interests.  Pursuant to the Conversions, the Bank purchased Nations Funds shares in exchange for assets that had been individually managed by the Bank and/or held in Common Trust Funds (fee and expense free in-house investment pools).   Such purchases by the Bank "bulked up" some pre-existing funds and "jump-started" others to cause the Nations Funds to have substantial asset bases, an important selling point in marketing the mutual fund shares to the public. The Nations Funds selected for investment of fiduciary assets by the Bank and Bank Subsidiaries pursuant to the Conversions were intended generally to "mirror" the categories of assets held by the Bank's fiduciary accounts pre-Conversion, all or most of which were liquidated immediately prior to the Conversions, either as part of so-called "Common Trust Funds" or in individually-managed accounts.

> C.     *Conversions*

32.     Historically, the Bank and its predecessors invested the assets comprising the Kutten Trusts, the Crowley Trust, the Scharff Trusts, the Lubbe Trusts, and those of members of the Class, primarily through individually managed portfolios and/or through so-called "Common Trust Funds" or "Collective Investment Funds." The expenses of the Bank for such investment vehicles and related administrative services were paid by the Bank from the fees it collected for serving as corporate fiduciary.

33.     As a result of the use of its proprietary funds, not only did the Bank abdicate many of its traditional fiduciary responsibilities and services to beneficiaries of its fiduciary accounts, the Bank's use of its proprietary funds was intended to generate higher fees to the Bank and its subsidiaries.  The fees realized from the fiduciary accounts, in the form of fees and

expenses paid to the Bank by the Nations Funds, resulted in the Bank's ability to collect more than just  the trustee or similar fees historically paid to the Bank.

34.      Throughout the Class Period defined below, the Defendants developed and implemented the general corporate investment policy pursuant to which most, or all, of the assets in accounts such as the Kutten Trusts, the Crowley Trust and the Lubbe Trusts and other fiduciary accounts similarly situated, would be uniformly converted into shares of the Nations Funds (the "Conversion"), or only invested in such mutual funds at the outset.

35.      As part of this corporate policy, investment in non-proprietary funds would be prohibited to the greatest extent possible. Indeed, in a letter from the Bank dated October 1, 1999 to the Hon. Mary Ann Medler, the mother of the Medlers, and a beneficiary of the Lubbe Trusts, the Bank reiterated its policy to only invest in its proprietary funds:

> The [Investment Review] Committee [of the Bank] reiterated that **the use of outside mutual funds in fiduciary accounts is in violation of our corporate policy.** [Emphasis added].

> See Exhibit "A" attached hereto and incorporated herein by reference.

36.      The Federal Reserve System in Supervisory Letter SR 97-3 (SPE) (February 26, 1997) warned banking organizations that:

> "conversion could result in conflicts between the best interests of the organization and the best interests of its fiduciary customers.  The banking organization must also determine that the mutual fund shares are suitable for accounts which previously held common trust fund units. Another possible conflict of interest could arise from the use of *proprietary* mutual funds when there are unaffiliated mutual funds or alternate investment opportunities available that may be equally appropriate for the participant's portfolio. Again, the appearance that the organization put its own interests above those of its fiduciary customers may cause concern particularly if investments are made in a newly established proprietary fund with no history or track record. It is important that the organization thoroughly document its decision to transfer CTFs into proprietary mutual funds."

See Exhibit "B" attached hereto and incorporated herein by reference.

As described more fully in this Complaint, the Bank routinely ignored its conflicts of interest and put its own interests before those of the Plaintiffs and the other members of the Class. Its flouting of the Federal Reserve's clear guidelines as set forth above breached the fiduciary duties the Bank owed to Plaintiffs and the members of the Class.

37.    In part to implement safeguards in fulfillment of  Federal Reserve concerns, the FDIC and the Office of Comptroller of Currency ("OCC"), federal regulators for national banks, have created Trust Examination Manuals to serve as guides to banks, including the Bank, in their asset management activities, including directing fiduciary account assets into proprietary mutual funds. The federal government provides an outline on investing to avoid a breach of fiduciary duty. The criteria for proprietary mutual fund investing are contained in Section 3 - Asset Management - Part I.  These include due diligence standards which include establishing written investment policies, adoption of procedures for periodic review and comparison with other available funds and establishment of an arm's length process for evaluating the prudence of investing fiduciary accounts in proprietary and bank advised mutual funds rather than in non-proprietary alternative investments. Additionally, the manual suggests on-going comparisons of proprietary funds to peer group performance and fees and warns of "hidden fees" and expense ratios which do not include total costs to the investor. The Bank has uniformly ignored such standards and guidelines and, by doing so, breached its fiduciary duties to Plaintiffs and the members of the Class.  See Exhibit "C" attached hereto and incorporated herein by reference.

38.    Section 8 of the Trust Examination Manual - Compliance/Conflicts of Interest, Self-Dealing and Contingent Liabilities sets forth prophylactic measures to be undertaken by banks to avoid fiduciary transactions which may be set aside by the beneficiary, including documenting management's actions with respect to transactions involving real or potential conflicts of interests, including the prudence of such transactions and that that such

documentation be readily available.  This section also alerts banks to issues relating to their receipt of traditional trustee's fees and the additional fees received by the Bank from investments in its proprietary funds and what a bank must do to guard against breach of duty. Notwithstanding such guidance, the Bank did not and does not document the individual investment decisions it made and makes for its fiduciary accounts, which decisions are made on a wholesale and/or computerized model basis without regard for the best interests of the beneficiaries thereof. Nor is there documentation which supports the Bank's decisions to force its fiduciary accounts to be subject to excessive fees and expenses which would not have been incurred if the Bank had continued to invest fiduciary assets in the pre-existing Common Trust Funds.  See Exhibit "D" attached hereto and incorporated herein by reference.

39.    Excerpts from Appendix C - Fiduciary Law, attached to the Trust Examination Manual, list the states that have removed the *per se* ban on the use of proprietary mutual funds (none of which have ever excused a Bank from further analysis as to whether the use of such funds violated a fiduciary duty) and Federal Reserve Supervisory Letter SR 99-7 (SPE) (March 26, 1999) entitled "Supervisory Guidance Regarding the Investment of Fiduciary Assets in Mutual Funds and Potential Conflicts of Interest" which discusses the fiduciary pitfalls in the financial incentives for banks to place trust assts into particular mutual funds. As described herein, the Bank routinely ignored its conflicts of interest in making investment decisions for its fiduciary accounts, thereby ignoring the foregoing supervisory guidance provided by federal banking regulators.  See Exhibit "E" attached hereto and incorporated herein by reference.

40.    Additionally, the OCC has published handbooks on conflicts of interest and personal fiduciary services discussing the appropriate methods to deal with the use of proprietary mutual funds in fiduciary accounts. Appendix E to the Conflict of Interest handbook discusses what banks must do to ensure compliance with fiduciary duties when using mutual

funds, including annually reviewing accounts on an individual basis to insure that the proprietary mutual fund continues to be an appropriate investment for the account. The Bank uniformly failed to make such annual, individualized, account-by-account reviews. Such failures were and are breaches of the fiduciary duties owed to Plaintiffs and members of the Class. See Exhibit "F" attached hereto and incorporated herein by reference.

41.     In contravention of the guidelines offered by the federal agencies which supervise banks' fiduciary activities, nothing was considered by the Bank on an account by account basis to establish the propriety of Nation Funds investments, particularly as compared with Common Trust Funds or alternate, non-proprietary mutual funds available for purchase.  At best, the Bank, in some cases, conducted cursory reviews of whether the instrument establishing the fiduciary account prohibited mutual fund investments and/or whether state law prohibited the use of  proprietary mutual funds in the account. The Bank converted Common Trust Funds and other assets into the Nations Funds for its own benefit to jump-start its asset management business and build up its mutual fund business without regard to federal regulations, the Federal Reserve's Supervisory letter, the OCC,  or the FDIC guidelines.

42.     The Defendants implemented their business plan to force more and more fiduciary assets into the Bank's Nations Funds beginning sometime prior to the commencement of the Class Period, through its "Private Bank."  The Private Bank sent out standardized form letters informing some co-trustees, beneficiaries of fiduciary accounts, and others, of the Bank's planned liquidation of its "Common Trust Funds" and touting the so-called "benefits" of the Conversions and certain mutual funds "reorganizations".  While all of these Conversions and reorganizations were carried out on a rolling basis and assets were held in individual accounts in various states, the Conversions did not differ from each other in any material way and all were in furtherance of the Defendants' plan and scheme.

43.     The standardized form letter, signed by David W. Fisher, President, also coerced

the recipients of the letters to authorize the Conversion of the Trusts' assets into shares in the

Nations Funds, in further disregard of the Bank's fiduciary duties, stating:

> Any common trust fund units for which we have not
> received an authorization [by May 1, 2000] may be
> liquidated and the proceeds placed in a money market
> vehicle pending discussion about reinvestment. This
> liquidation could have adverse tax consequences
> depending upon the cost basis of the common trust fund
> units.

44.     Mr. Fischer touted the benefits of the Conversions:

> Using Nations Funds, we can provide trust and
> fiduciary accounts with an attractive mix of
> investments to pursue the accounts' investment
> goals. Nations Funds also offer the benefits of:
>
> Daily valuation and liquidity
> Newspaper performance listings
> Broader potential diversification
> Flexibility when making trust distributions

In reality, there was little, if any, benefit that would flow to beneficiaries of the Bank's

fiduciary accounts arising from the Conversions.

45.     Indeed, all such so-called "benefits," could have been accomplished by means

of the Bank's direct investment of fiduciary assets internally or through its fee and expense free

"Common Trust Funds." Curiously, on or about August 16, 1999, the Bank announced that

"Common Trust Funds will be valued at month-end instead of twice each month," despite the

fact that computer software programs existed that could generate such valuations on a daily

basis. Throughout the Class Period, the Bank could have, but for its own selfish reasons, chose

not to value fiduciary assets on a daily basis, which it was capable of doing.

46.     As a result of the Conversions, the fees and expenses paid by Plaintiffs' and

other fiduciary accounts increased dramatically. Some fees and expenses were disclosed in or

with Mr. Fisher's form letters, which also advised that the fiduciary accounts would be given a credit against certain of such charges. As testified to by Darcy Johnson, a former officer and Portfolio Manager of the Bank, she could not determine the amount of such credits and, despite her position within the Bank, could not readily determine how, in fact the credits were calculated and how much they would be for any particular account. In reality, the credits were a small portion of the substantially increased fees and expenses borne by fiduciary account beneficiaries. An example of the Bank's description of the credits to members of the Class is set forth below in a communication (Form 3.05D 7/1999) entitled "Disclosure of Investment in Nations Funds":

> The fee paid directly by the [Fiduciary] Account to the Bank will be reduced (but not below zero) by the Account's pro rata share of the investment advisory fees paid by the Funds to the Service Providers; provided however, that the amount of the reduction will be based on Bank of America Corporation's percentage ownership of the Service Provider. From time to time, the Bank may elect to reduce the Account's fees in recognition of amounts paid by Nations Funds for other services (such as administrative services), but it is not obligated to do so, and the amount of any such fee reduction may vary. The Account will not be charged a sales "load" for buying or redeeming Fund shares described in the accompanying prospectuses.

Such form went on to state:

> I acknowledge receipt of the current prospectuses for the Funds and a Nations Funds Fee Disclosure Statement. As co-fiduciary for this account, I understand that the Service Providers will be paid investment advisory and other fees by the Funds. **I approve the method for reducing the investment management fees paid to the Bank by the Account**. I understand and agree that the Bank may choose not to reduce the Account's fee on the account of the compensation paid by the Funds for other services, but the Bank is electing to do so at this time.

47.    Members of the Class had no practical way of knowing or understanding how their individual accounts would be affected either by the Conversions or the investments of the

assets therein in Nations Funds or that the Bank was to receive substantial benefits therefrom. Even as to those beneficiaries of fiduciary accounts who recognized there was the possibility of substantially increased fees and expenses, relatively few raised the issue given their relationships with and reliance on the Bank. Certainly, none of them could have wanted to have his or her fiduciary account charged excessively for a marginal "benefit." Indeed, Plaintiff Kutten clearly indicated she did not authorize the Bank to charge a fiduciary fee *and* fees and expenses associated with mutual fund ownership and wrote "NO DOUBLE CHARGES" on one of the multiple forms sent to her.

48.     The Bank breached its duty to beneficiaries of its fiduciary accounts by, *inter alia,* causing these increased expenses to be incurred when they were neither necessary nor integral to prudent investment decisions. By causing its fiduciary accounts to absorb these unnecessary and imprudent fees and expenses in the wake of the Conversions or otherwise, the Bank breached its fiduciary duties to Plaintiffs and the other members of the Class. In further violation of its fiduciary duty to the beneficiaries of the affected accounts, the Bank knowingly and for its own benefit permitted the investment advisory and administrative contracts between and among NFT, the NFT Trustees and the Bank Subsidiaries to be entered into on a no-bid basis[3] Integral to the Conversions was the disposition of assets either held in the Common Trust Funds or otherwise. Because it was determined to proceed with the Conversions for its own benefit, the Bank permitted possible negative tax effects as a result of the wholesale disposition of the assets in the affected fiduciary accounts.

49.     Upon information and belief, as a result of  agreements among the Defendants and the senior officers of the Bank, no credit was applied to the affected fiduciary accounts for many

---

[3] Neither NFT nor the NFT Trustees, sought to obtain the lowest fees from the Bank Subsidiaries actually operating the Nations Funds. Indeed, as stated by New York Attorney General Eliot Spitzer: "Fund directors do not – and

of the substantial operating expenses of the Nations Funds which were passed along to the Bank's fiduciary accounts.  This materially reduced the net investment returns to these accounts, such as those of the Kutten, Crowley, Lubbe and Scharff Trusts.  Further, in order to increase the profits of the Defendants and the Bank Subsidiaries, the Bank and/or such subsidiaries could re-allocate certain expenses incurred by the Nations Funds so that the fiduciary accounts would not be entitled to "credits" and thus directly increase costs for the affected fiduciary accounts. Indeed, upon information and belief, most of such credits, to the extent given, have now been substantially reduced on a nationwide basis.

50.    As indicated above, even after the Bank applied  so-called credits against its fees to some fiduciary accounts for some portion of the advisory and administrative fees charged to the Nations Funds, in practical terms, it was (and is) impossible for co-fiduciaries, beneficiaries and others (including the Bank's own "trust officers" and "portfolio managers") to understand and know the true cost of ownership of Nations Funds to the fiduciary accounts.  Indeed, plaintiffs Kutten, Arnold, the Medlers and Scharff, as well as other beneficiaries, have sought to obtain such information or other similar information relating to the expenses of investing the assets of fiduciary accounts in the Nations Funds from the Bank and have never received "straight" or any answers to their questions with respect thereto and have received misleading or deceptive information as to the impact of such investments upon them and their fiduciary accounts.

51.    In violation of its fiduciary duty, the Bank encouraged the beneficiaries to be passive in the face of its machinations. By way of example, Mr. Fisher's letter of August 31, 2000 sent to beneficiaries with Nations Funds prospectuses was purportedly "for information

---

cannot – negotiate hard on the fees."

only" and recipients, including Plaintiffs, were told: "**you do not need to take any action.**"
[Emphasis in original].

52.     The Investment Policy Committee ("IPC") of the Bank, the committee charged
with evaluating investments for fiduciary accounts, was involved in the decision to approve the
Conversions of Common Trust Funds into the Nations Funds. The  members thereof knew in
advance of the Conversions that the fiduciary accounts affected by the Conversions would be
forced to incur materially higher expenses, post-Conversion, than they had previously. Neither
the IPC nor the Bank officers made any effort to change the Bank's plans with respect to the
Conversions or the manner in which fiduciary accounts were induced to pay excessive expenses
generally, which expenses would increase, post-Conversion, on average at least 20-30 basis
points (approx. 1/5 to 1/3 of 1%) and, in some cases, substantially more, in addition to some
capital gains tax liability. Instead of avoiding such excessive and unnecessary expenses, the
Bank provided information with respect to the expense ratios for the Nations Funds in the
various Nations Funds prospectuses as well as the  information regarding fee credits quoted
above in ¶46.  The beneficiaries were left on their own to figure out, if they could, whether  their
accounts would pay more for the services related to the Nations Funds investments than they
had paid pre-Conversion for the pre-existing investments.

53.     Upon information and belief, each affected fiduciary account sustained a
minimum increase in fees and expenses of 20-30 basis points (.20-.30%).  Given the growth of
the Nations Funds mutual funds in the hundreds of billions of dollars, most of which comes
from the Bank's fiduciary accounts, and the number of years the Bank has extracted these fees
and expenses from the fiduciary accounts, compensatory Class-wide damages are quite
substantial and are well in excess of $5 million, exclusive of interest and costs.

54.     In violation of the Bank's fiduciary duty, the Bank specifically excluded as permissible mutual fund investments non-proprietary mutual funds such as the Vanguard and Fidelity mutual funds and others specifically requested by Judge Medler as well as Plaintiffs Kutten and Arnold from their considerations.  In order to maximize its earnings and those of its corporate affiliates, the Bank failed to consider leaving the assets of fiduciary accounts invested as they were, pre-Conversion, and/or giving beneficiaries of such accounts a choice as to the various alternatives available.  Indeed, only after more than five years of complaints by the Medlers, did the Bank agree to replace the Nations Funds with the highly ranked, lower-expense Vanguard Funds.   Similarly, the Bank failed to consider making changes in the Bank's "Common Trust Funds" so as to provide the purported "benefits" that the Bank claimed would be forthcoming as a result of the Conversions, such as providing "daily pricing."  The requests of Plaintiffs Kutten, the Medlers and Arnold and other beneficiaries of the Bank's fiduciary accounts for changes in investments were repeatedly rebuffed, even when the changes were requested by co-fiduciaries.

55.     The Nations Funds investments in Plaintiffs' and others' fiduciary accounts resulted in the Bank and BAC receiving millions of dollars in purported money management, investment, advisory, administrative, direct brokerage and other fees. At the same time, the Bank received trustee or similar fees for serving as a corporate fiduciary.  Additionally, the Bank received the benefits of substantially reduced operating expenses for the Bank's fiduciary operations and the bulking up the Nations Funds.

56.     In addition to the circumstances  referred to above, the Bank violated its fiduciary duty by  *inter alia*, making investments for fiduciary accounts in the "Columbia Cash Reserves" and the Nations Funds equivalent fund, the returns of which were lower than the Bank paid to

depositors who walked into its retail branches "off the street" with no-pre-existing fiduciary relationship.

57.     Upon information and belief, Plaintiffs and all members of the Class suffered damages from the investment and fiduciary service-related practices of the Bank as described above in an amount which cannot presently be determined but which is capable of calculation and they are entitled to compensation therefore as well as restitution of the Defendants' unjust enrichment.

58.     Although many states, if not all, permit the investment of fiduciary funds in proprietary mutual funds, such statutory authorization is not a blanket waiver of a corporate fiduciary's over-riding duty of loyalty and  prudence to its beneficiaries and its duty to put the interests of its beneficiaries paramount.  Moreover, trust instruments or other documents which establish fiduciary relationships which may not prohibit the use of mutual fund investments, proprietary or not, do not authorize a fiduciary to ignore its duties and put its interests above those of its beneficiaries, as the Bank has done with respect to its investments of fiduciary assets in the Nations Funds.

## THE COMPTROLLER OF THE CURRENCY

59.     On or about December 16, 2004, the Bank, as a result of certain of the wrongdoing described herein and otherwise, entered into a written agreement with the Office of the Comptroller of the Currency (No. AA-EC-04-35) signed by the Bank's two most senior officers, pursuant to which it agreed to cease and desist such wrongful conduct and to effectuate corrective actions to address such conduct. Notwithstanding its agreement with the Comptroller, the Bank continues to flagrantly breach its obligations thereunder (as well as to the beneficiaries in its care), including its continued wholesale purchasing of shares of Nations (now Columbia) Funds shares for its fiduciary accounts. Unless further remedial steps are taken, the Bank will

continue to not only flout its agreement with the Comptroller, but to breach its duties to the beneficiaries of its fiduciary accounts as described herein and otherwise.

## CLASS ACTION ALLEGATIONS

60.     Plaintiffs restate and reallege each and every allegation set forth in the paragraphs above as if stated herein.

61.     Plaintiffs Mary Ann Arnold, the Medlers. and Elsie Mahler Scharff ("Class Plaintiffs") bring this action on their own behalf respectively, and pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure as a class action on behalf of the following Class:

> all beneficiaries, owners, beneficial owners, or principals of trusts, accounts or other entities for which the Bank or any of its parents, subsidiaries, affiliates, predecessors, successors or assigns acted as a trustee, fiduciary or agent and that were directly or indirectly invested in Nations Funds mutual funds at any time from September 8, 1998 to the present (the "Class").

This Class has already been stipulated to by each of the Defendants, their affiliates and others in connection with the settlement of certain related claims against them in *In re Mutual Funds Investment Litigation*, MDL-1586, where it was designated as a "Fiduciary Sub-Class".  None of the claims set forth in this Complaint are asserted by members of the Class who have executed valid and legally binding releases or with respect to those claims barred by the expiration of applicable statutes of limitations.

62.     The California Sub-Class consists of those members of the Class whose fiduciary accounts originated in and/or involved beneficiaries residing in California (such as Plaintiff Arnold). The Missouri Sub-Class consists of those members of the Class whose accounts originated in and/or involved beneficiaries residing in Missouri (such as Plaintiffs Scharff and the Medlers, as well as Plaintiff Kutten in her individual capacity). The Conversions Sub-Class consists of all those members of the Class who, within the Class Period, have had their fiduciary

accounts at the Bank subject to one or more Conversions. Such definitions are subject to modification upon completion of discovery with respect thereto.

63.     *Numerosity*: The members of the Class and Conversions Sub-Class are so numerous that joinder of all members is impracticable. The exact number of members of the Class and the Conversions Sub-Class as above described is not known by Plaintiffs, but is within the sole knowledge of the Bank. Upon information and belief, there were and are at least 180,000 fiduciary accounts (comprised of trusts, estates, retirement accounts and other types of fiduciary accounts), controlled by the Bank with, collectively, more than 500,000 beneficiaries thereof, approximately 10% of which are members of the California Sub-Class and 10% of which are members of the Missouri Sub-Class. These approximations are subject to discovery and the exact numbers of Class and Sub-Class members is readily ascertainable from the Bank's records.  Upon information and belief, the members of the Class and Sub-Classes are located in most or all fifty states, and in numerous foreign countries. Similarly, members of the California and Missouri Sub-Classes are located throughout Missouri, California and in many other states. Similarly, it is estimated that there are more than 10,000 members of the Conversions Sub-Class.

64.     *Commonality*:   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class or Sub-Classes. This case is not about the administration of individual fiduciary accounts; rather, the implementation of an across-the-board business decision of Defendants, on a nationwide basis, to invest the Bank's  fiduciary funds in the Nations and Columbia Funds in breach of its fiduciary duties, and contrary to the rules, regulations and standards of fiduciary conduct promulgated by federal banking regulators. The common questions of fact and law, include but are not limited to:

(a)     Whether the Bank breached its fiduciary duty to Plaintiffs as a consequence of Defendants' business decision to invest assets of the Bank's fiduciary accounts in the Nations and Columbia Funds without regard to the best interests of the Class members (which the Bank had a duty to put before its own) and by Defendants' desire to generate management and investment advisory fees for themselves, their affiliates and subsidiaries, to lower the Bank's expenses of managing fiduciary assets and to generate other benefits for themselves by *inter alia*, "bulking-up" the assets invested in the Nations and Columbia Funds;

(b)     Whether the Bank breached fiduciary duties by failing to conduct its fiduciary operations in conformity with the requirements of the National Banking Act and other applicable law;

(c)     Whether the Bank breached its fiduciary duty by making fiduciary account investment decisions based upon the interests of the Defendants' and their affiliates, rather than the interests of the beneficiaries of such accounts;

(d)     Whether the Bank had a uniform policy of only investing fiduciary accounts in its proprietary funds, rather than other competitive funds in the market place;

(e)     Whether the Bank trained and employed its Portfolio Managers to routinely and systematically make investments for fiduciary accounts, either wholly or predominantly using the Nations Funds, without disclosing various conflicts of interest; and

(f)     Whether the Bank breached its contractual obligations to the Class Plaintiffs and members of the Class by failing to provide individualized investment and other fiduciary services to which such persons were entitled pursuant to the underlying

written instruments which established the fiduciary relationships which are the subject of this litigation.

65.     *Typicality*: The claims of the Class Plaintiffs are typical of the claims of the Class and respective Sub-Classes because each is a victim of the Bank's breach of fiduciary and contractual duty and from whose account the Defendants  were unjustly enriched.  The implementation by the Bank of its strategies to enhance its own income at the expense of the beneficiaries of fiduciary accounts applies to each Class Plaintiff in a manner identical to that of the remaining members of the Class and Sub-Classes. As noted above, a central allegation in this case involves*, inter alia*, the Bank's  breach of fiduciary duty by its acting in its own interests and contrary to the interests of Class Plaintiffs and members of the Class in the face of over-arching conflicts of interest between and among the Class Plaintiffs, members of the Class, and the Bank and BAC,  all of which present a mixed question of law and fact.

66.     *Adequacy*:  The Class Plaintiffs will adequately and vigorously defend the interests of the Class and respective Sub-Classes and prosecute the claims alleged herein on behalf of each of them.  Plaintiffs Scharff, the Medlers and Arnold are able to and will fairly and adequately protect the interests of the  Class and  Sub-Classes, respectively.

67.     The attorneys for the Class Plaintiffs are experienced and capable in complex litigation and will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

68.     The relief sought is common to the entire Class including, *inter alia:*

(a)     a  judgment that the Bank violated its fiduciary duty as trustee (or other similar fiduciary role), the Consent Decree with the Comptroller of the Currency with respect to the affected fiduciary accounts and otherwise ignored and/or flouted

the rules, regulations and guidelines of federal banking regulators with respect thereto;

(b)     payment by the Defendants of compensatory damages caused by such breaches of fiduciary and contractual duty, as well as  punitive damages, as appropriate;

(c)     payment by the Defendants of the costs and expenses of this action, including Plaintiffs' attorneys' fees;

(d)     an injunction preventing the Bank from opposing petitions by beneficiaries of the affected fiduciary accounts seeking to replace the Bank as corporate fiduciary; and

(e)     an injunction which establishes appropriate procedures and safeguards within the Bank to ensure that the interests of beneficiaries of the Bank's fiduciary accounts are fully protected from wrongdoing such as described herein.

## COUNT I

## COUNT I  - BREACH OF FIDUCIARY DUTY

69.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

70.     Upon information and belief, the Bank's decision to invest the assets of the fiduciary accounts in its care in the Nations Funds was motivated not by the interests of Plaintiffs and the members of the Class but by Defendants' desire to generate investment advisory and other fees for the Bank and BAC and to reduce the Bank's operating expenses and to generate additional revenues by other means derived from the Nations Funds.

71.     Upon information and belief, the Bank failed to consider the Nations Funds' high expense ratios or alternative lower cost families of non-proprietary mutual funds (or deliberately did not do so) or to maintain the *status quo* with pre-existing investments (through Common

Trust Funds or otherwise) when it invested the assets of fiduciary accounts in shares of the Nations Funds, thus putting its own interests before those of the beneficiaries of fiduciary accounts.

72.     The Bank failed to consider the best interests of the beneficiaries of the affected accounts when it invested their fiduciary assets in the Nations Funds and breached its duty of loyalty to them by putting the interests of itself and its affiliates before the interests of Plaintiffs and the members of the Class.

73.     As a result of, *inter alia*, the Bank's improper wholesale transfer of fiduciary assets held by fiduciary accounts into shares of the Nations Funds, the beneficiaries of the Trusts or other similarly situated accounts for which the Bank was a fiduciary have been damaged in an amount to be determined, but believed to be substantially in excess of $5 million.

## COUNT II - PLAINTIFFS' CLAIM FOR PUNITIVE DAMAGES

74.     The conduct of the Defendants was outrageous because of the Defendants' self-dealing in the face of obvious conflicts of interest. The Bank acted with malice and evil motive as well as reckless indifference to the rights of the Plaintiffs and all others similarly situated in implementing the Conversions and otherwise looting of fiduciary accounts in the Bank's care. The Bank:

(a)     Deliberately and knowingly breached its fiduciary duty by profiting unjustly from the fiduciary relationships and causing its fiduciary accounts to be subjected to the increased expenses they would incur as a result of the Conversions and otherwise, which expenses inured to the benefit of the Bank in flagrant violation of the Bank's duty of loyalty;

(b)     Deliberately and knowingly breached its fiduciary duty by changing the investment vehicles historically used by the Bank for investment of fiduciary assets to the Nations Funds, specifically to  "bulk up" the Nations Funds and

otherwise generate revenues and profits for the Defendants at the expense of the beneficiaries of the Bank's fiduciary accounts, all of which conduct was and is in flagrant violation of the Bank's duties of loyalty and prudence;

(d)     Deliberately and knowingly breached its fiduciary duty by causing the beneficiaries of fiduciary accounts to incur excessive expenses and  capital gains taxes in connection with the Conversions and/or the reorganizations of mutual funds within the Nations Funds in flagrant violation of the Bank's duties of loyalty and prudence; and

(e)     Deliberately and knowingly breached its fiduciary duty by taking advantage of conflicts of interest and engaging in self dealing transactions and failing to consider whether such conduct was in the sole interests of the beneficiaries of the Bank's fiduciary accounts to whom the Bank owed a fiduciary duty, including the duties of loyalty and prudence and instead, put their interest in generating revenues and profits for the Bank and BAC ahead of those to whom the Bank owed  fiduciary duties.

75.     As a result of the foregoing egregious conduct, Plaintiffs request that the Court award them substantial punitive damages to punish Defendants and deter them from continuing to act as described herein, which conduct is being carried out to the present.

## COUNT III - AIDING AND ABETTING

76.     Plaintiffs Arnold and Scharff, on behalf of themselves and others similarly situated, and Plaintiff Kutten, on behalf of herself and her daughters, repeat and reallege each and every allegation contained above as if fully set forth herein.

77.     Upon information and belief, Defendants and their senior officers, as part of a corporate business decision, caused the Bank to purchase for the fiduciary accounts of Plaintiffs

and the members of the Class shares of the Nations Funds as part of the Conversions and otherwise in order, *inter alia*, to generate investment advisory fees and other fees for its various subsidiaries and affiliates and to "bulk-up" the Nations Funds without regard to whether such investments were prudent and in the best interests of Plaintiffs and the other beneficiaries of fiduciary accounts.

78.     The foregoing Conversions of the assets of fiduciary accounts to the Nations Funds and the purchase by the Bank of such shares generally was carried out in furtherance of Defendants' corporate plan to reduce the Bank's expenses of managing fiduciary assets and increasing their overall direct and indirect profits from fiduciary operations, one of its objectives in consolidating the operations of the Acquired Banks, and from and through the Nations Funds, generally. BAC and the Bank proceeded to carry out the Conversions since they would not merely profit from the Bank's trustee and similar fiduciary fees but "double dip" by generating additional revenues through the Defendants' related asset management businesses, administrative service businesses and otherwise. Additional profit was also generated by adding the assets in the Bank's fiduciary accounts to the Nations Funds following the Conversions, thereby making them more saleable at retail to the investing public. Further, the Conversions created an opportunity for the Bank to avoid the relatively low profitability of managing the fiduciary accounts (and the expenses related thereto) which the Bank had contracted to do when it (and/or its predecessors) agreed to serve as fiduciary thereof, and substitute ever-increasing fee income directly and through its corporate subsidiaries and affiliates.

79.     The Bank's wholesale investment of the assets in most of its fiduciary accounts in  shares of the Nations Funds pursuant to the Conversions carried out around the country, was a breach of its fiduciary duty to Plaintiffs and the members of the Class, which breach was

aided, abetted and/or directed by BAC and its affiliates, including NFT and the Bank

Subsidiaries as set forth herein.

80.     BAC was at all times aware that the Bank was committing a breach of fiduciary

duty to its beneficiaries and participated therein as aforesaid and by purchasing shares of its

proprietary mutual funds product for the fiduciary accounts in its care. "A third party who has

notice that the trustee is committing a breach of trust and participates therein is liable to the

beneficiary for any loss caused by the breach of trust." Restatement of Trust, Second § 326

(1957); *Massie v. Barth*, 634 S.W.2d 208 (Mo. App. E.D. 1982).

81.     As a result of BAC's aiding and abetting of Defendant Bank, the beneficiaries of

its fiduciary accounts have been damaged in an amount to be determined by the Court, but

believed to be substantial.

### COUNT IV  - UNJUST ENRICHMENT

82.     Plaintiffs repeat and reallege each and every allegation contained above as if

fully set forth herein.

83.     The trusts, wills and other documents pursuant to which the Bank was designated

corporate fiduciary conferred a benefit on the Defendants by affording the Bank the opportunity

to control vast amounts of assets and to earn fees from the stewardship thereof.     The

Defendants, directly and indirectly, not only accepted fees from these accounts but unjustly

exploited them as described herein. The fiduciary accounts became the Bank's primary

distribution channel for the proprietary funds to allow it to siphon fees and profits from the

fiduciary accounts. As set forth herein, to allow the retention of a benefit to the Bank would be

unjust and inequitable. Further, as amply described herein, the Bank has been a faithless

fiduciary, putting its own interests before those of Plaintiffs and members of the Class. As such,

it was unjustly enriched by charging and retaining any fees for serving as a corporate fiduciary

31

during the Class Period, all of which fees should be returned to the affected fiduciary accounts or otherwise disgorged to Plaintiffs and members of the Class, together with all of the Bank's earnings thereupon.

84.     By causing the Bank's fiduciary assets in affected accounts to be invested in the Nations Funds, the Bank and BAC have "double dipped." The Bank and BAC have unjustly benefited from the Conversions the investment of fiduciary assets in the Nations Funds generally, and from the other acts described herein, thereby unjustly enriching themselves at the expense of Plaintiffs and the members of the Class and the members of the respective  Sub-Classes.

85.     Such "double dipping" was carried out by the Bank and BAC by, *inter alia*, imposing on the Bank's fiduciary accounts, through the Bank Subsidiaries and otherwise,  the Bank's fees for acting as a corporate fiduciary, as well as investment advisory and administrative fees, and other related charges.  These fees, when taken together with all the Nations Funds' expenses, even after so-called credits applied by the Bank, exceeded the amounts to which the Bank was entitled to for, *inter alia*, investment of the fiduciary assets and administration of the underlying fiduciary accounts for which services its trustee or similar fees were intended to cover. Such benefits to the Bank and BAC were exacerbated by the Bank's avoidance of substantial operating expenses by reason of its abdication of its individualized investment and administrative responsibilities owed contractually and otherwise to the members of the Class. The Bank enhanced its profit performance at Plaintiffs' expense by favoring the use of its own Nations Funds and investing in them to increase the Nations Funds' asset bases, and aggrandize its own stature under the guise of allegedly providing more services to participants in its so-called "Private Bank" and otherwise.

86.     The Defendants have invested the proceeds of the foregoing unjust enrichment and realized additional profits thereupon, all of which should be returned to the Trusts and other similarly affected accounts and/or their beneficiaries, as the Court shall deem appropriate (e.g., a proportionate share of the Defendants' profits during the years of misappropriation) pursuant to California Probate Code, Section 166440(a)(1) and otherwise.  Missouri statutes impose strict liability against fiduciaries such as the Bank which,  "at their sole risk" make investments that are improper such that the Bank is "absolutely liable" to Plaintiffs Scharff, the Medlers and others in the Missouri Sub-Class for their damages. (§362.550.5  R.S.Mo.).  Plaintiffs and others similarly situated are entitled to recover the Bank's ill-gotten gains and profits there from.

## COUNT V - BREACH OF CONTRACT

87.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

88.     By means of the acceptance by the Bank and its predecessors of the trusteeship of the Crowley, Lubbe and Scharff Trusts and each of the other fiduciary accounts affected by the Conversion, the Bank and its predecessors committed to provide to all such fiduciary accounts complete investment management services of a corporate fiduciary, and render such services on an individualized basis consistent with the goals and objectives of plaintiff Arnold's grandfather, plaintiff Scharff's father, Plaintiff Medler's grandmother and the other creators of fiduciary accounts and the needs of the beneficiaries thereof. As the Bank states: **"It is our responsibility to invest the trust assets prudently and profitably according to the grantor's wishes as outlined in the trust document."  Such promise by the Bank and its predecessors was a material implied term of each trust agreement or other document which established the underlying fiduciary relationship.**  No grantor of a fiduciary account anticipated or could

reasonably foresee that the Conversion would be carried out by the Bank with fiduciary assets or that the Bank would mishandle fiduciary assets as described herein or that the designated fiduciary would be the Bank in its present form. Further, as set forth in those Counts not asserted on behalf of the Class, the Bank ignored the express provisions of the Kutten Trusts with respect to the investments made for them by the Bank and otherwise.

89.     Plaintiffs and each member of the Class were and/or are beneficiaries of the Bank's contractual obligations to the creators of the Trusts and other fiduciary relationships. By abdicating its responsibilities for individual investment management services and/or through "Common Trust Funds" or "Collective Investment Funds" in favor of the wholesale Conversion of fiduciary assets as described herein that the Bank was obligated to provide to the beneficiaries of its fiduciary accounts, and by conducting itself in its present business form, the Bank breached its contractual obligations thereto.

90.     By virtue of the Bank's breach of its contractual obligations to the members of the Class and Missouri and California Sub-Classes, plaintiffs and the members thereof have suffered damages in an amount to be determined by the Court.

## COUNT VI - BREACH OF CONTRACT

91.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

92.     This Count is brought by plaintiffs on behalf of those members of the Class who are beneficiaries of Trusts and other fiduciary accounts originally established with the designated fiduciary being one of the banks acquired by and/or merged into the Bank or its predecessors i.e. the Acquired Banks.

93.     As with the trusts established by plaintiff Scharff's parents and the Medler's grandmother with Boatmen's Trust Company as designated corporate Trustee or by plaintiff Arnold with the Bank of Santa Monica as designated corporate Trustee, the grantors of all affected Trusts selected as Trustee institutions which promised and agreed to deliver personalized fiduciary services to the beneficiaries thereof. Implicit in the contractual fiduciary relationship between the grantors and the Acquired Banks was the provision of a full range of personalized fiduciary services, including individualized investment management.

94.     The Bank, by eliminating the personalized fiduciary services to members of the Class, including, *inter alia*, individualized investment management, materially breached the explicit and implied terms of the Indentures of Trust or similar documents which initially caused the formation of such Trusts, including, but not limited to the following:

(a)     failing to provide appropriate trained personnel to supervise and monitor the performance of the assets in their charge, including a uniform failure to invest in appropriate asset classes;

(b)     bouncing plaintiffs and others similarly situated to poorly manned and anonymous "Call Centers" with whom there was no pre-existing relationship, trust and fealty;

(c)     changing without plaintiffs' and others similarly situated consent representatives of the Bank to deal with plaintiffs who had no knowledge of plaintiffs' circumstances and others similarly situated or the purposes for which the Trusts were established; and

(d)     continuing to charge fiduciary fees when failing to perform the services the services that the Acquired Banks had agreed to perform.

95.     Because the transfer of fiduciary responsibilities from the Acquired Banks substantively and materially affected the pre-existing fiduciary relationship with the Bank, it

was obliged to give notice to Class members of, inter alia, the terms of the merger or business combination, the forthcoming material changes in the relationship and provide to them the opportunity to seek a replacement fiduciary.

96. By virtue of the foregoing lack of appropriate notice and the material change in fiduciary services delivered by the Bank to members of the Class following the acquisition of the Acquired Banks, such notice should now be provided to affected beneficiaries which, inter alia, provides them with the opportunity to seek a replacement fiduciary.

## COUNT VII - VIOLATION OF CALIFORNIA PROBATE CODE

97. Plaintiff Arnold repeats and realleges each and every allegation contained above as if fully set forth herein. The claims set forth herein are asserted on behalf of the California Sub-Class.

98. Pursuant to Section 16002 of the California Probate Code, the Bank owes and owed to Plaintiff Arnold and the members of the California Sub-Class, an absolute duty of loyalty.  In exercise of that duty, the Bank has a duty to administer its fiduciary accounts solely in the interest of the beneficiaries.

99. Pursuant to Section 16060 of the California Probate Code, the Bank owes and owed to Plaintiff Arnold and the members of the California Sub-Class a duty of loyalty.

100. By acting as alleged herein, the Bank has violated and continues to violate the duty of loyalty  it owes and owed to plaintiff Arnold and the members of the California Sub-Class. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to 16400 of the California Probate Code.

101. Pursuant to Section 16004 of the California Probate Code, the Bank owes and owed to Plaintiff Arnold and the members of the California Sub-Class a duty not to use or deal with fiduciary account property for its own profit, nor to take part in any transaction in which it

has an interest adverse to the beneficiary, such as it did with respect to the accounts of Plaintiff Arnold and the members of the California Sub-Class.

102.    By acting as alleged herein, the Bank has violated and continues to violate the duty not to use or deal with fiduciary account property for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Section 16400 of the California Probate Code.

103.    Pursuant to Section 16040 of the California Probate Code, the Bank owes and owed to Plaintiff Arnold and the members of the California Sub-Class a duty of care that includes the duty to invest fiduciary account assets prudently and with regard to individualized strategy appropriate and productive pursuant to Probate Code Sections 16007 and 16009. Pursuant to Probate Code Section 16014, the Bank is required to apply fully the special skills of a corporate fiduciary, and this duty heightens the duty of care otherwise applicable to it.

104.    By acting as alleged herein, the Bank has violated and continues to violate the duties of care and productivity it owes and owed to Plaintiff Arnold and the members of the California Sub-Class. Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Section 16400 of the California Probate Code.

105.    Pursuant to Section 16420 of the California Probate Code, Plaintiff Arnold and the members of the California Sub-Class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

106.    Pursuant to Section 16440 of the California Probate Code, the Bank is liable to Plaintiff Arnold and the members of the California Sub-Class for actual and punitive damages, attorneys' fees, interest, and such other relief as the Court may order.

## COUNT VIII  - BREACH OF FIDUCIARY DUTY UNDER CALIFORNIA LAW

107.    Plaintiff Arnold repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is brought on behalf of the California Sub-Class.

108.    Pursuant to Section 15002 of the Probate Code, the common law of California with respect to fiduciary and trust matters remains the law of the State of California, and Probate Code Section 16420(b) expressly preserves "any other appropriate remedy provided by statute or the common law.

109.    Pursuant to the common law of California, the Bank owes and owed to Plaintiff Arnold and each member of the California Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer its fiduciary accounts solely in the best interests of the beneficiaries, i.e. the members of the California Sub-Class.

110.    Pursuant to the common law of California, the Bank owes and owed to Plaintiff Arnold a duty not to take part in a transaction in which it had a conflict of interest, as it did and does as described above

111.    By acting as alleged herein, the Bank has violated its common law fiduciary duties of absolute loyalty  owed to Plaintiff Arnold and the members of the California Sub-Class.

112.    By acting as alleged herein, the Bank has violated its common law fiduciary duty not to participate in transactions in which it had or has a conflict of interest, as it does here.

113.    By acting as alleged herein, the Bank has violated its common law fiduciary duties of care and productivity it owes or owed to Plaintiff Arnold and the members of the California Sub-Class.

114. By acting as alleged herein, the Bank has violated its common law fiduciary duty that it owes or owed to Plaintiff Arnold and the members of the California Sub-Class to take and exercise prudent control over fiduciary assets.

115. The Bank and its affiliates have already unlawfully extracted huge sums in the form of fees and other charges assessed against itsfiduciary accounts, and they will continue indefinitely to extract unlawful fees and other charges from Plaintiff Arnold and the members of the California Sub-Class, all of which has caused them to incur and will cause them to incur damages in an amount which cannot be presently determined.

## COUNT IX - VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200

116. Plaintiffs Kutten and Arnold repeat and reallege each and every allegation contained above as if fully set forth herein. Plaintiffs Kutten and Arnold assert this cause of action in their capacity as private attorneys general on behalf of the members of the general public residing within the State of California and/or whose fiduciary accounts originated in California and, in the case of Plaintiff Arnold, on behalf of the members of the California Sub-Class.

117. The Bank has engaged in and continues to engage in unfair, unlawful and deceptive business practices, including but not limited to sending representatives from St. Louis, Missouri to meet with Plaintiff Kutten in Northern California, whereby it has conspired with BAC and its affiliates to force the Kutten Trusts and other of the Bank's fiduciary accounts to have their assets re-directed from individually managed accounts and/or so-called "Common Trust Funds" and/or other assets to proprietary mutual funds controlled by the Bank and its affiliates. Said Conversions have resulted in higher total direct and indirect fees and expenses charged to such fiduciary accounts than those historically paid to the Bank. Similarly, by forcing

assets in the Bank's fiduciary accounts to be invested in Nations Funds generally has caused the beneficiaries of such accounts to similarly be damaged by having such accounts overcharged by such fees and expenses.

118.    By acting as alleged herein, the Bank has violated its duties as a fiduciary, which constitutes breach of trust pursuant to Section 16400 of the California Probate Code.

119.    The unlawful acts and practices of the Bank as alleged herein, including violations of Section 16400 of the California Probate Code, constitute unlawful business practices within the meaning of California Business and Professions Code Section 17200, et seq.

120.    Unless the Bank is enjoined from continuing to engage in the foregoing unfair and deceptive business practices, Plaintiffs Kutten and Arnold and the other members of the general public residing within the State of California and/or whose fiduciary accounts originated in California and the members of the California Sub-Class will continue to be injured and damaged by the Bank's unfair business practices.

121.    So as not to be unjustly enriched by its own wrongful actions and conduct, the Bank should be required to disgorge and restore to Plaintiffs Kutten and Arnold and the other members of the general public residing within the State of California and/or whose fiduciary accounts originated in California and the members of the California Sub-Class all monies wrongfully obtained by it as a result of its wrongful conduct, together with interest and profits earned thereon.

### COUNT X - VIOLATION OF CALIFORNIA PRUDENT INVESTOR ACT

122.    Plaintiff Arnold repeats and realleges each and every allegation contained above as if fully set forth herein. The claims set forth herein are asserted on behalf of Plaintiff Arnold and the California Sub-Class and by Plaintiff Kutten individually.

123.    Pursuant to Section 16045 et. seq. of the California Probate Code ("the Prudent

Investor Act"), the Bank's duties, including investment and management of assets held in its fiduciary capacity, were and are to be handled as a prudent investor would, considering the purposes, terms, distribution requirements, and other circumstances of the beneficiaries thereof and the underlying fiduciary relationship. In order to satisfy this standard, the Bank has been required, at all relevant times, to exercise reasonable care, skill, and caution. As set forth above, the Bank has failed to do so with respect to the fiduciary accounts of Plaintiff Kutten, Plaintiff Arnold and the members of the California Sub-Class.

124.    In violation of the Prudent Investor Act, the Bank failed to make investment and management decisions prudently with respect to the individual fiduciary accounts of Plaintiff Kutten, Plaintiff Arnold and the members of the California Sub-Class within its care by, *inter alia*, making investment decisions for their respective accounts on a wholesale basis, rather than on an individual, account-by-account, basis. The Bank did so in the context of and as a part of an overall Bank-wide investment strategy which did not have the beneficiaries' individual risk and return objectives and their best interests put first and foremost.

125.    In violation of the Prudent Investor Act, the Bank failed to incur for its fiduciary accounts only those expenses that were and are appropriate and reasonable in relation to the assets, overall investment strategy, purposes, and other circumstances of the trust or other underlying fiduciary accounts. Rather the Bank allowed the Crowley Trust and other similarly affected fiduciary accounts to incur excessive expenses by virtue of its investing imprudently the assets therein in the Bank's proprietary mutual funds instead of cheaper and more economical non-proprietary mutual funds or in the Bank's own Common Trust Funds, which were free of fees and expenses.

126.    As a result of the Bank's violation of the Prudent Investor Act, Plaintiff Kutten, Plaintiff Arnold and the members of the California Sub-Class have been damaged in an amount

which cannot presently be determined.

## COUNT XI - VIOLATION OF MISSOURI PRUDENT INVESTOR ACT

127.    Plaintiffs Scharff and the Medlers repeat and reallege each and every allegation contained above as if fully set forth herein. The claims set forth in this Count are asserted on behalf of the members of the Missouri Sub-Class.

128.    Pursuant to Mo. Rev. Stat. § 469.900, et. seq. (the Missouri Prudent Investor Act), the Bank owes and owed to Plaintiff Scharff, the Medlers and the members of the Missouri Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts solely in the interests of the beneficiaries thereof.  While the governing instruments for the Plaintiffs' fiduciary accounts may not prohibit the use of proprietary funds, the Bank cannot, in reliance thereon, dispense with its fiduciary duty to perform in the best interests of beneficiaries rather than itself. A state law which may permit the use of proprietary funds as investments in fiduciary accounts, does not mandate that such funds be used over others that are more advantageous to the beneficiary and less advantageous to the Bank.

129.    Pursuant to the Missouri Prudent Investor Act, the Bank owes and owed to Plaintiffs Scharff, the Medlers  and the members of the Missouri Sub-Class a duty to exercise reasonable care, skill and caution in investment management decisions, to ascertain facts relevant to the investment and management of trust assets, and a duty to use the special skills and expertise it represented itself to possess when investing and managing trust assets.

130.    By acting as alleged herein, the Bank has violated and continues to violate the duty of loyalty  it owes and owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class. Such violations of the Bank's duties as fiduciary constitute breach of trust imposed by Missouri statute.

131.    Pursuant to the Missouri Prudent Investor Act and Mo. Rev. Stat 456.8-802, the Bank owes and owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class a duty not to use or deal with fiduciary assets for its own profit, not to take part in any transaction in which it has an interest adverse to the beneficiary, such as Plaintiffs Scharff, the Medlers and the members of the Missouri Sub-Class.

132.    By acting as alleged herein, the Bank has violated and continues to violate the duty not to use or deal with fiduciary assets for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Missouri statute.

133.    Pursuant to the Missouri Prudent Investor Act, the Bank owes and owed to Plaintiffs  Scharff  and the Medlers and the members of the Missouri Sub-Class a duty of care that includes the duty to invest fiduciary assets prudently with an individualized strategy appropriate to each fiduciary account and to each beneficiary thereof, and the duty to make fiduciary assets productive. Moreover, the Prudent Investor Act requires the Bank to apply fully the special skills of a corporate fiduciary, heightening the duty of care otherwise applicable to it

134.    By acting as alleged herein, the Bank has violated and continues to violate the duties and productivity it owes and owed to Plaintiffs Scharff  and the Medlers and the members of the Missouri Sub-Class. Clearly the Bank was interested in seizing new opportunities and lining its own pockets at the expense of Plaintiffs Scharff and the Medlers and those similarly situated.  Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Missouri law.

135.    The Bank and its affiliates have already unlawfully extracted huge sums in the form of fees and other charges assessed against fiduciary accounts and unless enjoined from doing so, they will continue indefinitely to extract unlawful fees and other charges from the

members of the Missouri Sub-Class, in an amount which cannot be presently determined in violation of §469.907.

136.    Plaintiffs Scharff  and the Medlers and the members of the Missouri Sub-Class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

137    The Bank is liable to Plaintiffs  Scharff and the Medlers and the members of the Missouri Sub-Class for actual and punitive damages because the Bank acted with reckless disregard for the rights of Plaintiff  Scharff, the Medlers and others' rights, attorneys' fees, interest, and such other relief as the Court may order.

## COUNT XII  - BREACH OF FIDUCIARY DUTY UNDER MISSOURI COMMON LAW

138.    Plaintiffs Scharff and the Medlers repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is asserted on behalf of the members of the Missouri Sub-Class.

139.    Pursuant to the common law of Missouri, the Bank owes and owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class an absolute duty of loyalty. In exercise of that duty, the Bank has a duty to administer the Trusts and other fiduciary accounts governed by Missouri law solely in the best interests of the beneficiaries, i.e. the members of the Missouri Sub-Class.

140.    By acting as alleged herein, the Bank has violated its fiduciary duty of absolute loyalty  owed to Plaintiffs  Scharff and the Medlers and the members of the Missouri Sub-Class.

141.    By acting as alleged herein, the Bank has violated its fiduciary duty not to participate in transactions in which it had or has a conflict of interest, as it did and does here.

142.    By acting as alleged herein, the Bank has violated its fiduciary duties of care and productivity it owes or owed to Plaintiffs Scharff and the Medlers and the members of the Missouri Sub-Class.

143.    By acting as alleged herein, the Bank has violated its fiduciary duty that it owes or owed to Plaintiffs Scharff, the Medlers and the members of the Missouri Sub-Class to take and exercise control over fiduciary assets.

144.    Plaintiffs Scharff, the Medlers and the members of the Missouri Sub-class may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest as described above.

145.    The Bank is liable to Plaintiffs Scharff, the Medlers and the members of the Missouri Sub-Class for actual and punitive damages because the Bank acted with reckless disregard for the rights of Plaintiffs Scharff, the Medlers and others' rights, attorneys' fees, interest, and such other relief as the Court may order.

**COUNT XIII**
**INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN**
**FOR BREACH OF FIDUCIARY DUTY**

146.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

147.    As noted above, plaintiff Kutten's family wealth commenced with the toils of her grandfather, Charles H. Yalem, who founded the Aetna Finance Co., later sold to International Telephone and Telegraph Corporation in 1960. Yalem, always a conservative investor, donated hundreds of thousands of dollars to St. Louis civic endeavors, including the St. Louis Zoo (the Charles H. Yalem Children's Zoo), St. Louis University, Jewish Hospital of St. Louis, Washington University, the St. Louis Symphony Orchestra and the St. Louis chapter of the

YMCA.  Yalem's experience with predecessors to the Bank commenced at least with St. Louis Union Trust which became Centerre Trust Co, which became Boatmen's Trust Co. Yalem's net worth was achieved as a result of a passion for cautious investing and he instilled in his son-in-law and daughter, Joseph and Carolyn Kutten, plaintiff Kutten's parents, the wisdom of careful and conservative investing so that future generations of the family might enjoy his good fortune. In turn, plaintiff Kutten's parents passed these virtues on to her. The Kutten family employed the St. Louis law firm of Bryan, Cave, McPheeters and McRoberts n/k/a/ Bryan Cave to draft the Kutten Trusts and represent them on estate planning matters.  The relationship of the Kutten family was not only with their trust company, it was with the individuals who represented the trust company who understood and appreciated the desires and needs of the entire family, including  plaintiff Kutten, a single mother of two children, as well as one of her brothers, a disabled person who is institutionalized and has special needs.  The Kuttens had long term personal relationships with several individuals, including Robert Hitpas and Richard Klapp. These individuals and their successors are no longer responsible for the portfolios entrusted to them.  Instead, the Bank boasts of a minimum of 450 faceless employees who answer customer inquiries at "Call Centers" established around the country.  The systemic change that occurred at the Bank when it acquired the predecessor banks and converted trust assets without the consent of plaintiff Kutten for its own gain and profit represents a classic instance of self-dealing and breach of loyalty, the antithesis of conduct expected of a fiduciary.  The Bank has breached its fiduciary duties to plaintiff Kutten and her daughters, including the duty of loyalty, and various duties highlighted by the federal regulations issued by the Office of the Comptroller of the Currency in 1996 directed to all national banks that act in a fiduciary capacity, with which the Bank failed to comply.[4]   The Bank:

---

[4] Plaintiff Kutten asserts no private cause of action thereunder.  Rather, the Bank's failure to comply with them is a

(a)      failed to exercise such specialized care and skill as is required of a fiduciary;

(b)      converted trust assets and their subsequent  purchase of the Bank's proprietary mutual funds, the Nations Funds;

(c)      failed to properly diversify investment portfolios of the Trusts, and acting in derogation of the settlor's expressed directions;

(d)      failed to adopt appropriate policies relevant to self-dealing and conflict of interest as required by and in violation of 12 CFR Part 9;

(e)      failed to preview the prospective account to determine if the account could be properly administered subsequent to the acquisition of Boatmen's Trust Co. by the Bank as required by and in violation of 12 CFR, part 9.6;

(f)      failed to properly invest funds waiting to be invested to obtain yields consistent with a reasonable rate of return as required by and  in violation of 12 CFR Part 9.10;

(g)      failed to assign at least two individuals to plaintiff Kutten's accounts as required by 12 CFR, part 9.13;

(h)      charged excessive fees for fiduciary compensation in violation of 12 CFR part 9.15;

(i)      failed to properly supervise personnel entrusted with the management of plaintiff Kutten's Trusts' assets to ensure implementation of the grantors' expressed directions;

(j)      failed to make appropriate trades in the equity and bond markets to enhance the achievement of the objectives of the Trusts, including failing, through neglect, to make trades of any kind for several years;

---

fundamental breach of fiduciary duty.

(k)      failed to establish a written plan to engage in the sale and marketing of Nations Funds to Trusts under its fiduciary control and failed to absorb the expenses of establishing a collective investment fund, instead charging the beneficiaries, including plaintiff Kutten a fee of not less than 0.01%;

(l)      failed to consider and advise the beneficiaries of the adverse tax consequences arising from a conversion of trust assets and the subsequent purchase of Nations Funds;

(m)      failed to consider alternative investments in funds whose returns and ratings are higher than Nations Funds which has scored low on nationally respected ratings;

(n)      created a wholly owned subsidiary to serve as the sole vendor of its own product to Trusts under its fiduciary management and control;

(o)      failed to resign as Trustee when demanded to do so by plaintiff Kutten, citing its need for business income as overriding its performance as a fiduciary duty and resigning only after plaintiff Kutten's citation of the innumerable occasions when the Bank had breached its duty to plaintiff Kutten and the Kutten Trusts;

(p)      failed to observe the parameters of the instructions with regard to conversion issued by the Federal Reserve Bank of the United States in SR 97-3 (SPE), providing [i]n determining whether to convert common trust funds to mutual funds, a banking organization must address the possibility that the conversion could result in conflicts between the best interests of the organization and the fiduciary."  Further, the Federal Reserve noted the existence of potential conflicts of interest for a national bank to engage in such transactions and the need for management to demonstrate that it has determined that the governing trust instrument for each affected customer authorizes investment in mutual funds and the mutual funds are suitable investments for the particular accounts;

(q)      lost administrative control of plaintiff' Kutten's accounts for an undetermined period of time in 2002 and 2003, including electronic access to the accounts and the paper files relating to same; and

(r)      failed to communicate with the plaintiff Kutten, return her phone calls and letters and failed to perform as requested by plaintiff Kutten with respect to modifying investment strategies consistent with the investment philosophy that reigned in her family for decades.

**COUNT XIV**
**INDIVIDUAL CLAIM OF PLAINTIFF**
**KUTTEN FOR BREACH OF FIDUCIARY DUTY**

148.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

149.    On information and belief, the Bank's decision to invest the assets of the Trusts in the Nations Funds was motivated not by the interests of plaintiff Kutten and her daughters but by BAC's desire to generate investment advisory and other fees for its affiliates and, indirectly, for itself, as well as to reduce the Bank's operating expenses.

150.    On information and belief, the Bank failed to consider the Nations Funds' high expense or alternative lower cost families of mutual funds when it invested the assets of the Kutten Trusts into shares of the Nations Funds thus putting its own interests before those of the beneficiaries of fiduciary accounts maintained for the Kutten Trusts.

151.    On information and belief, the Bank failed to consider the best interests of plaintiff  Kutten and her daughters when it invested the Kutten Trusts' assets in the Nations Funds and breached its duty of loyalty to them by putting the interests of itself and its affiliates before the interests of plaintiff Kutten and her daughters.    BAC was at all times aware that the

Bank was committing a breach of fiduciary duty to its beneficiaries and participated therein as aforesaid and by offering its proprietary mutual funds product to the fiduciary accounts. "A third party who has notice that the trustee is committing a breach of trust and participates therein is liable to the beneficiary for any loss caused by the breach of trust." Restatement of Trust, Second § 326 (1957); *Massie v. Barth*, 634 S.W.2d 208 (Mo. App. E.D. 1982).

152.    The Bank's wholesale investment of the assets of the Kutten Trusts in the Nations Funds was a breach of its fiduciary duty to plaintiff Kutten and her daughters, which breach was aided, abetted and/or directed by BAC and its affiliates.

153.    As a result of, inter alia, the Bank's improper wholesale transfer of fiduciary assets held by fiduciary accounts the Kutten Trusts into shares of the Nations Funds, the accounts of plaintiff Kutten and her daughters for which the Bank was a fiduciary have been damaged in an amount to be determined by the Court, but believed to be substantial.

### COUNT XV
### INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN FOR BREACH OF CONTRACT

154.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

155.    By means of the acceptance by the Bank and its predecessors of the trusteeship of the Kutten Trusts, the Bank and its predecessors committed to provide to such Trusts complete investment management services of a corporate fiduciary, and render such services on an individualized basis consistent with the goals and objectives of plaintiff Kutten's parents and the needs of the beneficiaries thereof. As the Bank states: "It is our responsibility to invest the trust assets prudently and profitably according to the grantor's wishes as outlined in the trust document." No grantor of a Trust anticipated or could reasonably foresee that the Conversion would be carried out by the Bank with Trust assets or that the designated fiduciary would be the

Bank in its present form. Further, as set forth in those Counts not asserted on behalf of the Class, the Bank ignored the express provisions of the Kutten Trusts with respect to investments and otherwise.

156.    Plaintiff Kutten and her daughters were beneficiaries of the Bank's contractual obligations to the creators of the Kutten Trusts and other fiduciary relationships. By abdicating its responsibilities for individual investment management services and/or through "Common Trust Funds" in favor of the wholesale Conversion of fiduciary assets that the Bank was obligated to provide to the beneficiaries of its fiduciary accounts, and by conducting itself in its present business form, the Bank breached its contractual obligations to plaintiff Kutten, her parents and daughters.

157.    By virtue of the Bank's breach of its contractual obligations to plaintiff Kutten, her parents and her daughters, plaintiff Kutten and her daughters have suffered damages in an amount to be determined by the Court.

158.    The Bank has breached its contractual obligations to plaintiff Kutten and her daughters in their individual capacities as a result of its failure to adhere to the terms of the Kutten family's engagement of the Bank and its predecessors as a fiduciary and plaintiff Kutten as well as her daughters have been damaged.

## COUNT XVI
## INDIVIDUAL CLAIM OF PLAINTFF KUTTEN FOR BREACH OF CONTRACT

159.    Plaintiff Kutten repeats and realleges each and every allegation contained above as if fully set forth herein.

160.    This Count if brought by plaintiff Kutten as a beneficiary of Trusts originally established with the Boatman's Trust Company, being one of the Banks acquired by and/or merged into the Bank.

161.   Boatmen's Trust Company, as designated corporate Trustee, promised and agreed to the settlers of the Kutten Trusts and its beneficiaries to deliver personalized fiduciary services. Implicit in the contractual fiduciary relationship between the plaintiff Kutten's parents and Boatman's Trust Company was the provision of a full range of personalized fiduciary services, including individualized investment management.

162.   The Bank, by eliminating the personalized fiduciary services to plaintiff Kutten, including, inter alia, individualized investment management, materially breached the explicit and implied terms of the Kutten Trusts, including, but not limited to the following:

(a)   failing to provide appropriate trained personnel to supervise and monitor the performance of the assets in their charge, including failing to invest in appropriate asset classes;

(b)   bouncing plaintiff Kutten to poorly manned and anonymous "Call Centers" with whom these was no pre-existing relationship, trust and fealty;

(c)   changing without plaintiff Kutten's consent representatives of the Bank to deal with plaintiff Kutten who had no knowledge of plaintiff Kutten or the purposes for which the Kutten Trusts were established; and

(d)   continuing to charge excessive fiduciary fees when failing to perform the services the services that Boatman's Trust Company had agreed to perform;

(e)   failing to follow the explicit directions of grantor Joseph Kutten in the Grandchildren's Trust by failing to "invest the assets of the trust primarily in U.S. Treasury bills, or other debt obligations backed by the full faith and credit of the United States Government" and by investing the assets of the Trust in mutual funds which was not authorized.

163.   Because the transfer of fiduciary responsibilities from Boatman's Trust Company substantively and materially affected the Kutten Trusts' pre-existing fiduciary relationship with

the Bank, it was obliged to give notice to plaintiff Kutten of, inter alia, the terms of the merger

between it and Nations Bank, the forthcoming changes in the relationship and provide to them

the opportunity to seek a replacement Trustee.

164.    Although not provided with said notice, plaintiff Kutten sought the resignation of

the Bank in early October, 2003.  In response, on October 17, 2003, the Bank incredibly insisted

that they be allowed to remain a trustee:

> The (Bank's) Committee decided that they would not resign from
> these trusts.  It was a business decision that was based on the fact
> that Bank of America does not want to give up your business.
> Bank of America, like everyone else, has felt the effects of the
> poor economy and has become very reluctant to voluntarily resign
> as trustee.

165.     The Bank continued to resist resignation until plaintiff Kutten's counsel wrote a

seven page letter citing the many examples of the Bank's breach of duties in the administration

of the trusts of plaintiff Kutten and her daughters.

## COUNT XVII
## INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN FOR UNJUST ENRICHMENT

166.    Plaintiff  Kutten repeats and realleges each and every allegation contained above

as if fully set forth herein.

167.    By reason of defendant BAC's causing the Bank's fiduciary assets in affected

accounts to be invested in the Nations Funds, the Bank and BAC  have "double dipped." The

defendants have profited by the Conversion and the subsequent acts described herein, thereby

unjustly enriching themselves at the expense of plaintiff Kutten and her daughters.  Defendants

have similarly enriched themselves, their subsidiaries and affiliates by using information

regarding the plaintiff Kutten to market various goods and services including credit cards, loans

and deposit accounts, from which products and services they have been unjustly enriched.

168.   Such "double dipping" was carried out by the Bank and BAC by imposing on plaintiff Kutten's accounts the Banks' fees for acting as a corporate fiduciary as well as investment advisory fees, and other related charges which, when taken together with all the Nations Funds' expenses, even after so-called credits for certain Nations Funds advisory fees, exceeded the amounts to which the Bank was entitled to payment for, inter alia, investment of the fiduciary assets, for which services its Trustee or similar fees were intended to cover. Such benefits to the Bank and BAC were exacerbated by the Bank's avoidance of substantial operating expenses by reason of its abdication of its individualized investment responsibilities owed to plaintiff Kutten and her daughters. The Bank enhanced its profit performance at plaintiff Kutten's expense by favoring the use of its own Funds and investing in same to increase its own asset base, and aggrandize its own stature under the guise of allegedly providing more services to participants in its "Private Bank"  The Bank's objectives were clear from its telling press release in July 14, 1999:

> United by the merger of Bank of America and NationsBank,
> NationsBanc Investments, Inc., and BA Investment Services, Inc.,
> became one brokerage company on July 12. The birth of Banc of
> America Investment Services, Inc., the new name for the retail
> brokerage, gives investors a powerful ally within the Bank of
> America franchise.   (For the full press release, see
> http://www.bankofamerica.com/newsroom/press/press.cfm?PressI
> D=
> press.19990714.03.htm&LOBID=1>).

169.   The defendants have invested the proceeds of the foregoing unjust enrichment and realized additional profits thereupon, all of which should be returned to the Kutten Trusts as the Court shall deem appropriate (e.g. a proportionate share of the defendants' profits during the years of misappropriation).  Missouri statutes impose strict liability against fiduciaries who "at their sole risk" make investments that are improper such that the Bank is "absolutely liable" to

plaintiff Kutten for their losses.  §362.550.5  R.S.Mo.  Plaintiff Kutten and her daughters are

entitled to recover the Bank's ill-gotten gains and profits.

<u>COUNT XVIII</u>
<u>INDIVIDUAL CLAIM OF PLAINTIFF KUTTEN</u>
<u>VIOLATION OF MISSOURI PRUDENT INVESTOR ACT</u>

170.    Plaintiff Kutten repeats and realleges each and every allegation contained above

as if fully set forth herein.

171.    Pursuant to § 469.900 (formerly §456.520.2 R.S.Mo. and §456.900 *et. seq.*

R.S.Mo.*)* ("The Prudent Investor Act")  RSMo. (2000), the Bank owes and owed to plaintiff

Kutten and her daughters an absolute duty of loyalty. In exercise of that duty, the Bank has a

duty to administer the Trusts and other fiduciary accounts solely in the interests of the

beneficiaries thereof.

172.    Pursuant to §469.905 (formerly §456.905 R.S.Mo), the Bank owes and owed to

plaintiff Kutten and her daughters an absolute duty of loyalty. In exercise of that duty, the Bank

has a duty to administer the Kutten Trusts governed by the Missouri law solely in the best

interests of the beneficiaries.

173.    Pursuant to the Missouri Prudent Investor Act, the Bank owes and owed to

plaintiff Kutten and her daughters a duty to exercise reasonable care, skill and caution in

investment management decisions, to ascertain facts relevant to the investment and management

of trust assets, and a duty to use the special skills and expertise it represented itself to possess

when investing and managing trust assets.

174.    By acting as alleged herein, the Bank has violated and continues to violate the

duties of loyalty and candor it owes and owed to plaintiff Kutten and her daughters.  Such

violations of the Bank's duties as fiduciary constitute breach of trust imposed by Missouri

statute.

175.    Pursuant to the Missouri Prudent Investor Act and §456.570.2 R.S.Mo., the Bank owes and owed to plaintiff Kutten and her daughters a duty not to use or deal with fiduciary assets for its own profit, not to take part in any transaction in which it has an interest adverse to the beneficiary, such as plaintiff Kutten and her daughters.

176.    By acting as alleged herein, the Bank violated the duty not to use or deal with fiduciary assets for its own profit, and the duty to not take part in any transaction in which it had a conflict of interest. Such violations of the Bank's duties as fiduciary constitute breach of trust pursuant to Missouri statute.

177.    Pursuant to the Prudent Investor Act, the Bank owes and owed to plaintiff Kutten and her daughters  a duty of care that includes the duty to invest fiduciary assets prudently and with regard to individualized strategy appropriate to each fiduciary account and to each beneficiary thereof, and the duty to make fiduciary assets productive. Moreover, the Prudent Investor Act requires the Bank to apply fully the special skills of a corporate fiduciary, heightening the duty of care otherwise applicable to it.

178.    By acting as alleged herein, the Bank has violated the duties and productivity it owed to plaintiff Kutten and her daughters. Clearly the Bank was interested in seizing new opportunities and lining its own pockets at the expense of plaintiff Kutten and her daughters. Such violations of the Bank's duties as fiduciary constitutes breach of trust pursuant to Missouri law.

179.    Plaintiff Kutten may maintain a cause of action against the Bank for its breaches of its duties as fiduciary and its participation in transactions in which it had or has a conflict of interest, as it does here.

180.    The Bank is liable to plaintiff Kutten for actual and punitive damages because the Bank acted with reckless disregard for plaintiff Kutten's rights, attorneys' fees, interest, and such other relief as the Court may order.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Arnold, Medler and Scharff respectfully request on their own behalf, and on behalf of all members of the Class and the Sub-Classes identified above, and Plaintiff Kutten requests on behalf of herself, and her daughters for an order:

(a)    Certifying this action as a Class Action and appointment of Class Plaintiffs and their counsel to represent the Class and the various Sub-Classes;

(b)    Entering judgment on the claims for breach of fiduciary duty in favor of Plaintiffs individually and Class Plaintiffs Arnold, Medler and Scharff as representatives of the other members of the Class and Sub-Classes and against the Defendants of their compensatory damages, treble damages as appropriate and punitive damages in favor of Plaintiffs individually and as representatives of the other members of the Class and Sub-Classes and against the Defendants in the amount of damages caused by the Defendants' breaches of fiduciary duties;

(c)    Entry of judgment on the claims for breach of contract in favor of Plaintiffs and the Class and Plaintiff Kutten in the amount of damages caused by the Bank's breach of contract;

(d)    Entry of judgment enjoining the Bank from opposing any petition filed by any member of the Class or Missouri or California Sub-Classes seeking the removal

of the Bank as corporate fiduciary and requiring the Bank to pay for all legal fees and expenses incident thereto including its own;

(e)     Entry of judgment compelling the Defendants to account for their unjust enrichment and disgorging the amount thereof (and the profits earned thereupon) to the fiduciary accounts, including the Kutten, Crowley, Lubbe and Scharff Trusts, affected by the wrongdoing described herein and/or their beneficiaries, as appropriate;

(f)     Entry of judgment compelling the Bank to fully insulate its fiduciary operations from all of its other business activities and those of BAC

(g)     Entry of judgment compelling the Bank to establish and implement procedures to fully protect the interests of the members of the Class including, *inter alia*, the appointment of an ombudsman to oversee the Bank's fiduciary operations;

(h)     Repayment to the affected Nations Funds of the damages caused to them by the Defendants' actions as described herein or failing that to the members of the Class who indirectly sustained damages;

(i)     Pre-judgment and post-judgment interest at the maximum rate allowable by law;

(j)     Reasonable attorneys' fees and reimbursement of the reasonable costs and expenses of prosecuting this litigation and distributing the recovery to  members of the Class and the various Sub-Classes; and

(k)     Such other or additional relief as this Court deems appropriate.

October 24, 2006

GREENFIELD & GOODMAN LLC
RICHARD D. GREENFIELD
7426 Tour Drive
Easton, Maryland

(410)745-4149
(410) 745-4158 (Fax)
Lead Counsel for Plaintiffs and the Class


SUMMERS, COMPTON, WELLS & HAMBURG
PROFESSIONAL CORPORATION

/s/ Steven M. Hamburg
STEVEN M. HAMBURG          #3313
HOLLY M. MCINTYRE          #112203
8909 Ladue Road
St. Louis, MO 63124
(314) 991-4999
(314) 991-2413 (Fax)

RICHARD A. LOCKRIDGE
W. JOSEPH BRUCKNER
GREGG M. FISHBEIN
LOCKRIDGE GRINDAL NAUEN PLLP
Suite 2200
100 Washington Avenue South
Minneapolis, MN 55401
(612) 339-6900
(612) 339-0981 (Fax)


GANCEDO & NIEVES LLP
Hector G. Gancedo
Amy M. Boomhouwer
144 W. Colorado Blvd.
 Pasadena, CA 91105
(626) 685-9800

COUNSEL FOR PLAINTIFFS AND THE CLASS

528685